Submitted on briefs May 11, affirmed June 21, 1921.

# FIRST STATE AND SAVINGS BANK *v.* OLIVER

## ET AL.

### (198 Pac. 920.)

**Fixtures—Tests as Between Grantor and Grantee or Mortgagor and Mortgagee Stated.**

1. In deciding whether an article used in connection with real property should be considered as a fixture and a part and parcel of the land, as between a grantor and a grantee or mortgagor and mortgagee, the usual tests are: (1) Real or constructive annexation of the article to the realty; (2) appropriation or adaptation to the use or purposes of the realty with which it is connected; (3) the intention to make the annexation permanent.

**Fixtures—Considerations in Ascertaining Whether It was the Intention to Maks Permanent Annexation Stated.**

2. The intention of making the article permanently accessory to the real property is to be inferred from the nature of the article, the relation of the party making or maintaining the annexation, the policy of the law in relation thereto, the structure and mode of annexation, and the purpose and use for which it is made.

**Fixtures—Rights of Parties may be Governed by Special Agreement.**

3. The rights of parties as to personalty attached to the land may be controlled by special agreement between the parties.

---

1. When and against whom fixtures may retain character of personal property, see note in 84 **Am. St. Rep.** 877.

**Fixtures—Pumps and Motor Constituting Part of Pumping System Held Fixtures.**

4. Five and six inch centrifugal pumps, annexed to land, and a ten horse-power electric motor as a part of the pumping system, but which was sometimes detached from one pump and moved to and connected with another part of the system, but which was never disconnected or removed from the land, which pumps and motor were essential to the irrigation and drainage of the land, *held* fixtures.

**Fixtures—Mortgaging of Property not a Consideration Unless Mortgage was Executed by Owner or One Having Interest in the Property Involved.**

5. In order for the making of a mortgage upon articles constituting parts of a pumping system, or upon the real property upon which they are placed, to have any influence upon the question of whether they are personal property or a part of the land, the mortgage must be executed by the owner, or one having an interest in the property involved.

From Klamath: D. V. KUYKENDALL, Judge.

In Banc.

This is a suit to foreclose a chattel mortgage. The trial court found and decreed that the mortgage be foreclosed as against all of the property described therein except, one ten-horse power electric motor, one six-inch centrifugal pump, and one five-inch centrifugal pump, which the court found to be the property of defendants Margaret H. Barney and William M. Bray. Plaintiff appeals.

The claim of defendants Barney and Bray is, that the motor and pumps are part of the real estate and were never owned by defendant Oliver. It is the contention of defendant Oliver and plaintiff that the motor and pumps are personal property owned by Oliver and mortgaged to the bank.

The controversy arises by virtue of the following facts: On April 15, 1918, the plaintiff bank loaned to defendant C. T. Oliver $680, and to secure the payment of the note given therefor Oliver executed to the bank a chattel mortgage upon the electric motor

and two pumps in dispute and certain farm machinery, implements and livestock. This mortgage was duly recorded. On and prior to March 22, 1917, E. R. Reames, the president of the First National Bank of Klamath Falls, Oregon, was the owner of a ranch in Klamath County, Oregon, near the city of Klamath Falls, known as the Race Track Ranch, upon which he had considerable personal property, some of which was included in the chattel mortgage in suit. Mr. Reames being desirous of selling this property, listed the same for sale or trade with defendant Oliver, who was engaged in the real estate business in the city of Klamath Falls. Oliver negotiated with one McKillop through Rucker & Company of San Francisco, California, for the transfer of the property. A trade was finally consummated, whereby Mr. Reames took certain property which is not involved in this suit, and in consideration therefor conveyed the Race Track Ranch with a lot of the personal property thereon. Mr. Reames took a mortgage from McKillop on the Race Track Ranch for $4,000. In order to make the deal Oliver at the same time made a contract to repurchase the ranch and personal property from McKillop, including the ten horse electric motor and the two pumps. A deed of the farm was executed by McKillop and wife to Oliver, and also a bill of sale of the personal property connected with the ranch, and deposited in escrow with the First National Bank of Klamath Falls, to be delivered to Oliver upon the payment to McKillop of the sum of $5,500, balance of the purchase price for which a promissory note was executed by Oliver to McKillop. It was stipulated in the escrow agreement that upon the payment by Oliver of $1,500 on the principal of the note the bill of sale should be delivered to him.

Upon the payment of the balance, the deed was to be delivered to him.   Oliver, pursuant to the agreement, took possession of the land and personal property. It was afterwards agreed between Mr. McKillop and Mr. Oliver that as Oliver desired to sell some of the personal property he might do so and pay the money into the First National Bank of Klamath Falls for Mr. McKillop.   Upon such payment of $1,300, McKillop was to release the personal property on the farm to Oliver.   McKillop purchased some horses on the farm from Oliver, allowing him $500 therefor on the deal.   Pursuant to the arrangement Oliver sold some of the property at public auction and paid the $1,300 to the account of McKillop.   Rucker & Company transacted the principal part of the business pertaining to the deal for McKillop.   Mr. Reames testified that the First National Bank, as he remembered, was instructed by McKillop to release the personal property to Oliver by letter from McKillop. No written release was executed.   About January 10, 1918, Oliver was in San Francisco, where another deal by which he desired to trade his interest in the farm and the remainder of the personal property was being negotiated through Rucker & Company, and he wired the First National Bank of Klamath Falls, to send the escrow agreement to Rucker & Company.   As the Rucker firm had been the agent of McKillop during the transaction, the bank, on January 11, 1918, delivered the escrow papers to McKillop instead of mailing them to Rucker & Company.   McKillop has since retained these papers, and was not a witness in this case.   Just what property was described in the bill of sale is a matter of speculation.

On July 17, 1919, McKillop and wife sold and conveyed the farm, subject to the mortgage in favor of

Reames, to Margaret H. Barney of Wisconsin, defendant Bray acting as her agent. McKillop sold his interest in the personal property remaining on the ranch to Mrs. Barney, and on September 15, 1919, for the expressed consideration of the sum of $10 executed a bill of sale to Mrs. Barney to that effect. After the three-cornered deal between Reames, McKillop and Oliver, Oliver executed a chattel mortgage in favor of the First National Bank to secure the payment of a note, in which mortgage the motor and pumps in question were included with other property. After the chattel mortgage to the First National Bank was satisfied Oliver executed the mortgage in question to the plaintiff bank. Oliver never completed the purchase of the farm. Whatever right, if any, he obtained to the property in question was obtained as personal property. Bray, the agent of Mrs. Barney, it appears, had knowledge of the execution of plaintiff's mortgage about the time of the purchase of the farm for Mrs. Barney and before the execution of the bill of sale from McKillop to Mrs. Barney.

AFFIRMED.

For appellant there was a brief by *Mr. E. L. Elliott.*

For respondent C. T. Oliver there was a brief by *Mr. W. H. A. Renner.*

For respondents Margaret H. Barney and Wm. M. Bray there was a brief over the name of *Messrs. Ferguson & Fletcher.*

BEAN, J.—Having given a general history of the different deals claimed to affect the status of the property in suit, we will endeavor to outline more minutely the situation, use and purposes of the motor

and two pumps in question; this with a view of determining whether or not the property involved was a part of the real estate. Defendant Oliver never obtained title to the real property. It appears that he secured ownership and possession of the personal property sold by Reames to McKillop, and in turn transferred by McKillop to Oliver, who executed to the plaintiff a chattel mortgage. Whatever right Oliver then had to the property in question passed by way of the mortgage to plaintiff.

We should start with Mr. Reames' ownership. He owned all of the farm and fixtures and personal property sold and transferred to McKillop. We shall pass without further mention many of the side issues, and also conclusions stated by the witnesses as to what part of the property was real and what personal, and try to observe the concrete facts which govern the main question. It appears the farm is situated on the bank of the Klamath River. There were two pump-houses on the land, with a centrifugal pump in each used for pumping water from the river to irrigate the land. One of the pumps rested on timbers and the other also on timber resting on concrete. Both were securely fastened to their foundations with screws. The ten-horse power electric motor was fastened to a timber frame resting on the concrete foundation and connected with electric wiring, and remained on the place when the property was transferred to McKillop. Possession was taken by Oliver under the contract of purchase from McKillop. The motor was so arranged that the electric wire could be detached, and the motor and its frame placed upon a sled and moved to the other pumping plant where it fitted the foundation and could be securely screwed down to the same. Sometimes the motor was so moved and used. It usually remained

in one of the places.    Mr. Reames, while on the stand
as a witness for plaintiff, testified in regard to the
motor in part thus:

"Q. In connecting the motors with the wires,
wasn't that fixed in such a way it was easily discon-
nected so it could be moved easily?

"A. Well, we had to disconnect the wires from the
switch and then take off the switch and move that
down from the other place and then connect up there,
the same as moving any motor.

"Q. The motor was not set in any permanent
foundation, was it, like a cement foundation, any-
thing like that?

"A. At one—at the stand where it was used princi-
pally, there was a concrete foundation with timbers
on that and also the pump on the same timbers.    The
motor was on the other timbers that set on that, we
screwed down to it and made it stationary so as to
remain true and firm."

One of the pumps was sometimes used for pumping
water in order to drain the land.    The motor and
pump appear to have been a part of the irrigation
system connected with and used upon the land.    They
were essential for the purposes of irrigation and
drainage of the land.    How long this system had been
in use or when it was placed upon the land does not
clearly appear.

1. In deciding whether an article used in connec-
tion with real property should be considered as a fix-
ture and a part and parcel of the land, as between a
grantor and a grantee or mortgagor and mortgagee,
the usual tests are: (1) real or constructive annex-
ation of the article to the realty; (2) appropriation
or adaptation to the use or purposes of the realty
with which it is connected; (3) the intention to make
the annexation permanent.

2. The intention of making the article permanently accessory to the real property is to be inferred from the nature of the article, the relation of the party making or maintaining the annexation, the policy of the law in relation thereto, the structure and mode of annexation, and the purpose and use for which it is made: 19 Cyc. 1039; *Bay City Land Co.* v. *Craig,* 72 Or. 44 (143 Pac. 911); *Johnson* v. *Pacific Land Co.,* 84 Or. 356, 361 (164 Pac. 564); *Roseburg Nat. Bank* v. *Camp,* 89 Or. 67, 74 (173 Pac. 313); *Blake-McFall Co.* v. *Wilson,* 98 Or. 626 (193 Pac. 902). In the case of *Roseburg Nat. Bank* v. *Camp, supra,* at page 75, Mr. Justice Harris, speaking for this court said:

"Annexation, actual or constructive, is an essential element. Pure examples of constructive annexation are found in cases where after having been actually annexed an article is severed from the realty for some temporary purpose. * * In the instant case the pipe and giants can be removed without impairing them or injuring the land and therefore the single element of annexation is not conclusive. As was said by this court in *Doscher* v. *Blackiston,* 7 Or. 144, 146: the courts in many of the states have abandoned the notion that to constitute an irremovable fixture the article must be attached to the land by bolts or nails or be imbedded in brick or stone. * * "

It is the trend of judicial opinion to regard all of those things as fixtures which have been attached, whether physically or constructively to the realty with a view to the purposes for which the real property is held or employed, however slight or temporary the connection between the articles and the land. The important element to be considered is the intention of the party making the annexation. Neither the intention existing at the time of procuring the article nor that which exists while the same is being transported

to the real property where it is designed to be placed, nor the secret plan in the mind of the person making the annexation govern. The controlling intention is that which the law deduces from all of the circumstances of the installation of the article upon the land: *Roseburg National Bank* v. *Camp, supra,* and cases there cited.

3. In the recognition of these formulated general tests which may be applied in passing upon the question, it is obvious that they do not establish definite criteria. Each case must be determined, not only upon the circumstances and nature of the annexation and the use to which the property is employed, but also on the relations of the parties. These tests are subject to the qualification that the rights of the parties are liable to be controlled by special agreement: 11 R. C. L., p. 1059, § 3. We read in 11 R. C. L., p. 1061, § 5, thus:

"The second test, namely, the adaptation or application to the use or purpose of that part of the property with which it is connected, is generally considered as entitled to much weight, especially in connection with the criterion of intention, * * the tendency being to regard everything as a fixture which has been attached to realty with a view to the purposes for which the realty is held or employed, however slight or temporary the connection between them. So generally it may be said that if property is placed on land to improve it and make it more valuable it is generally deemed a fixture, but that if it is attached for use which does not enhance the value of the land it remains a chattel."

4. Applying these rules to all the facts and circumstances in the present case, we note that it is apparent that Mr. Reames, or whoever installed the irrigation system on the farm, did so with a view to enhancing the production of the farm, to increase the

growth of vegetation thereon. Irrigation in a semi-arid region, like parts of Klamath County, is the very life of the land. It is beyond comprehension that the system was installed for any temporary purpose. The motor and pumps served the purpose of ditches, canals and head-gates of a gravity system of irrigation, which are no doubt appurtenant to real property. The pumping system was doubtless placed upon the land to improve it and make it more productive and valuable and more agreeable for a habitation. The purposes for which the three articles were used indicate strongly that they were intended to be a part and parcel of the land. They were adapted to the purpose of the land to which they were attached. The annexation made was sufficient to stand the first test mentioned. While the motor was sometimes detached from one pump and moved to and connected with the other part of the system, it was never, as far as shown, disconnected or removed from the ranch. The pumps were permanently annexed to the freehold, and the motor was a part of the system which comprised the pumps.

"In some jurisdictions, if the realty is equipped with a complicated plant, some of which is so attached to the realty as to be a part thereof, and some not physically annexed, then on a transfer of the realty the entire plant is transferred, including the unattached parts, on the principle whereby an indispensable part of a machine is transferred": 19 Cyc. 1045.

From the nature of the irrigation system constructed on the farm, the relation and situation of the owner who installed the apparatus, the whole surroundings and mode of the annexation, the evident purpose thereof, and all the facts disclosed by the testimony, we conclude that the owner making the con-

nection and maintaining the system for a long time did so with the intention of making the system accessory to the real estate. Therefore the ownership of the motor and pumps did not pass to defendant Oliver with the personal property. He could not create a valid lien upon any greater interest than he owned by virtue of the mortgage executed to plaintiff. The title to the irrigation system passed by virtue of the deed from McKillop to Barney.

5. Counsel for plaintiff and also counsel for Oliver, earnestly urge that the fact that Oliver executed a mortgage in favor of the First National Bank, and also one to plaintiff covering the motor and pumps in question shows that the parties treated the property as personal. In order for the making of a mortgage upon articles of this nature or upon the real property upon which they are placed to have any influence upon the question whether they are personal property or a part of the land, as we understand, such mortgage must be executed by the owner or one having an interest in the property involved. Neither Reames, McKillop nor any other owner of the real estate described, executed a chattel mortgage on the motor and pumps in suit. Oliver could not change or affect the title of McKillop, the record owner of the land by executing a chattel mortgage upon any of the fixtures on the farm. The principle claimed does not apply in this suit.

As ruled in *Sowden* v. *Craig,* 26 Iowa, 156 (96 Am. Dec. 125, 130):

"Where the owner of real estate executes a mortgage upon chattels, which may properly be made fixtures, and subsequently affixes them to the real estate, that no person having knowledge of such facts can, by purchase of the real estate or otherwise, acquire from the mortgagor any title to such chattels paramount to the mortgagee thereof."

We are not concerned in the case at bar with the more liberal rule applicable when an article is annexed to realty by a tenant.

Plaintiff claimed $250, as attorney's fees for foreclosing the chattel mortgage for $860, and interest. The trial court allowed $150, as such fees. We think the Circuit Court was in a better position to decide what was a reasonable amount for such services than this court is. We approve this finding.

It follows that the decree of the trial court should be affirmed. It is so ordered.    AFFIRMED.