WYOMING STATE FARM LOAN
BOARD, an Agency of the State
of Wyoming, Appellant (Defendant),

James R. Rumery and Sharon L. Rumery,
husband and wife, A & I Equipment,
First Interstate Bank, and Louise Rumery (Defendants),

v.

FARM CREDIT SYSTEM CAPITAL
CORPORATION, Appellee
(Plaintiff).

No. 87–173.

Supreme Court of Wyoming.

July 21, 1988.

Joseph B. Meyer, Atty. Gen., Clinton D. Beaver, Asst. Atty. Gen., Cheyenne, for appellant (defendant).

Les Bowron of Donald R. Winship & Associates, P.C., Casper, for appellee (plaintiff).

Before CARDINE, C.J., THOMAS, URBIGKIT and MACY, JJ., and BROWN, J. (Retired).

BROWN, Justice.[1]

Appellant Wyoming Farm Loan Board (Board) challenges an order granting partial summary judgment in favor of appellee Farm Credit System Capital Corporation (FCSCC). The trial court found that certain gated plastic irrigation pipe was not a fixture to the debtor's real property, and found FCSCC owned the pipe. FCSCC's interest in the pipe is based on both an "after acquired property" clause in a 1969 security interest in farm and ranch equip-

---

1. Chief Justice, Retired, June 30, 1988.

ment that was perfected and properly continued, and a 1985 security interest in the pipe that attached, but does not appear to have been perfected. The Board's interest in the pipe is said to arise from language in a real estate mortgage covering the pipe as a fixture to the real property it irrigated. The Board frames its sole issue as:

"Has the gated pipe irrigation system in question become a fixture by virtue of its installation and use?"

We affirm.

### THE PIPE

The gated pipe involved in this dispute is plastic pipe with gates, or windows on one side that can be opened to regulate water flow onto a field. This pipe comes in lengths of twenty or thirty feet and diameters of six, eight and ten inches. A farmer or rancher uses the pipe by moving the needed lengths to the field on a special trailer, and laying them out end-to-end in the proper location. The pipe is then connected to riser pipes that are permanently attached to water lines buried underground. While the installation of the water mainline and the riser pipes clearly involves substantial earthwork, the gated pipe is specifically designed to be lightweight and portable for use in more than one field. A farmer or rancher using this system needs the gated pipe to irrigate. However, any farmer or rancher with a riser pipe connection could attach the gated pipe and irrigate his field with it. The pipe remains above ground at all times, and it is stored away from the field when not in use. One of FCSCC's affidavits in support of the motion for summary judgment suggests that the Rumerys' gated pipe was not always stored on their property. One of the Board's affiants states that the pipe is worth about $11,310.

### THE TRANSACTIONS

FCSCC is the present owner of all right, title and interest in two security agreements, executed in 1969 and 1985, between its predecessor in interest, the Wyoming Production Credit Association (WPCA) and James and Sharon Rumery.[2] The 1969 security agreement is evidenced in the record by a financing statement filed by WPCA on December 24, 1969, perfecting a security interest in "All of the Debtor's farm and ranch machinery and equipment."[3] This security interest remains valid today as a result of continuation statements filed in 1974, 1979 and 1984. Perfected security interests in other specific farm and ranch equipment, not involved in this case, were executed on June 20, 1979, and May 20, 1983.

In March 1985, the Rumerys borrowed $379,400 from WPCA, securing the debt with feed, hay, grain, other crops and "Any and all machinery and equipment * * *" they owned. The March 4, 1985, security agreement included an appendix listing specific farm and ranch equipment considered collateral under the agreement. The gated pipe is on that list. The agreement also contains a dragnet and future-advance clause. On October 12, 1985, the Rumerys received an additional loan of $10,000 from WPCA secured as a future advance under the 1985 security agreement. The record does not show that this latter security agreement has ever been perfected.

The Board's lien on the pipe is said to arise out of a mortgage on the real proper-

---

**2.** These agreements were executed pursuant to the Wyoming adoption of the Uniform Commercial Code, Art. 9 (U.C.C.), codified at § 34–21–901 to 34–21–966, W.S.1977 (Cum. Supp.1985). Each provision from Art. 9 cited in this opinion, contains identical language as currently codified unless otherwise indicated.

**3.** The 1969 security agreement is not in the record. The parties, however, have stipulated to its existence and to the coverage of all of the Rumerys' farm and ranch machinery and equipment, pursuant to Rule a 4.04, Wyoming Rules of Appellate Procedure, order from this court.

The stipulation includes recognition of the following clause in the 1969 agreement:

"The Secured Party and Debtor agree: that to the maximum extent permitted by law, any and all collateral of like type or kind as that described herein as part of the collateral, now owned or hereafter acquired by the Debt shall secure all obligations covered by this Security Agreement, and Secured Party shall have a security interest in all such collateral by reason of this Agreement, for the purposes herein described * * *."

ty owned by the Rumerys. On January 24, 1978, the Board loaned the Rumerys $87,000 to purchase and install an irrigation system on their property. That purchase included the gated pipe. The Board secured the debt on the loan by filing an "Irrigation Loan Mortgage" on the real property irrigated by the new system. This mortgage was recorded in the Fremont County Book of Deeds on January 24, 1978. The Board never filed on the pipe under the Uniform Commercial Code (U.C.C.)

On July 9, 1982, the Board loaned the Rumerys $143,000 to pay off the balance on the $87,000 Board loan and mortgage, and, to refinance some of their debt to WPCA. This loan was also secured by an Irrigation Loan Mortgage on the real property irrigated by the system. The mortgage includes the irrigated real property,

"\* \* \* together with all buildings and improvements thereon and all other privileges, hereditaments, and appurtenances belonging unto said land or in any way thereto appertaining, and including all water and water rights, adjudicated or unadjudicated, stored, used upon, or appropriated for the above-described lands together with all irrigation reservoirs, ditches, laterals, canals, flumes, aqueducts and syphons complete, or any interest therein regardless of how owned or represented \* \* \* with rights of way therefor, also all other irrigation works, drainage systems, artesian wells and water flowing therefrom, windmills and all other property and property rights of every kind and character, real and personal, pertaining to or used in connection with the irrigation and drainage of the lands mortgaged herein, or which may be appurtenant to said lands, whether owned by the MORTGAGOR at the date of this mortgage or hereinafter in any manner acquired by the MORTGAGOR

during the life or term of this mortgage; it being understood that when the word "premises" is hereafter used it covers all property of every kind and character contained in this paragraph."

Again, the mortgage was recorded in the county Book of Deeds, and there was no U.C.C. filing.

By 1986 the Rumerys were in default on the two WPCA loans. FCSCC filed an action seeking foreclosure on certain mortgage deeds that had been executed between WPCA and the Rumerys as additional security for the loans, and seeking disposition of the collateral listed in the 1969 and 1985 security agreements on May 21, 1986. FCSCC later amended its complaint to include the Board as a defendant. The Board answered on October 7, 1986, asserting a superior lien in the pipe under the July 9, 1982, Irrigation Loan Mortgage.

FCSCC moved for partial summary judgment on January 5, 1987. The Board responded, asserting that the gated pipe had become a fixture on the irrigated land and was covered by the real estate mortgage. On May 14, 1987, the trial court entered partial summary judgment favoring FCSCC. Final judgment was entered on May 27, 1987, and this appeal followed.

## FCSCC SECURITY INTERESTS AND FIXTURE FILING REQUIREMENTS

The Board, in its brief, has not set forth any explanation for the legal significance of its issue. We will discuss this briefly.

FCSCC relies primarily on its perfected 1969 security interest in after-acquired farm and ranch equipment. That interest was created when WPCA and the Rumerys executed a valid security agreement containing a general description of relevant collateral as after acquired farm and ranch machinery and equipment.[4] See §§ 34–21–

---

**4.** Section 34–21–909(a)(ii), W.S.1977, defines "equipment" as "goods"

"\* \* \* used or brought for use primarily in business (including farming or a profession) or by a debtor who is a nonprofit organization or a governmental subdivision or agency or if the goods are not included in the defini-

tions of inventory, farm products or consumer goods \* \* \*."

Section 34–21–905(a)(vi), W.S.1977, defines "goods" as:

"\* \* \* all things which are movable at the time the security interest attaches or which are fixtures (section 9–313 [§ 34–21–9421] ), but does not include money, documents, in-

920, W.S.1977; 34–21–922, W.S.1977 (Cum. Supp.1987); 34–21–923(a)(b), W.S.1977, (Cum.Supp.1987); and *Landen v. Production Credit Association of the Midlands,* Wyo., 737 P.2d 1325, 1328–1330 (1987). The interest was properly perfected under §§ 34–21–931 and 34–21–951, W.S.1977 (Cum.Supp.1987), when WPCA filed a general financing statement showing a security interest in " * * * [a]ll of the Debtor's farm and ranch machinery and equipment * * *." Under our recent holding in *Landen v. Production Credit Association of the Midlands, supra,* this financing statement was sufficient notice to a subsequent lender that a security interest in after acquired equipment existed.

The existence of perfected security interest in after-acquired property provides the legal basis for the Board's issue. If the pipe has become a fixture on the irrigated real property, FCSCC's 1969 security interest can only establish priority in the pipe if there has been a timely fixture filing [5] under § 34–21–942(d), W.S.1977 (Cum.Supp. 1987), which provides:

"(d) A perfected security interest in fixtures has priority over the conflicting interest of an encumbrancer or owner of the real estate where:

"(i) The security interest is a purchase money security interest, the interest of the encumbrancer or owner arises before the goods become fixtures, the security interest is perfected by a fixture filing before the goods become fixtures or within ten (10) days thereafter, and the debtor has an interest of record in the real estate or is in possession of the real estate; or

"(ii) The security interest is perfected by a fixture filing before the interest of the encumbrancer or owner is of record, the security interest has priori-

ty over any conflicting interest of a predecessor in title of the encumbrancer or owner, and the debtor has an interest of record in the real estate or is in possession of the real estate; or

"(iii) The fixtures are readily removable factory or office machines or readily removable replacements of domestic appliances which are consumer goods, and before the goods become fixtures the security interest is perfected by any method permitted by this article; or

"(iv) The conflicting interest is a lien on the real estate obtained by legal or equitable proceedings after the security interest was perfected by any method permitted by this article."

A fixture designation of the pipe might also raise an issue under § 34–21–942(f), concerning construction mortgages: [6]

"(f) Notwithstanding paragraph (i) of subsection (d) of this section but otherwise subject to subsections (d) and (e) of this section, a security interest in fixtures is subordinate to a construction mortgage recorded before the goods become fixtures if the goods become fixtures before the completion of the construction. To the extent that it is given to refinance a construction mortgage, a mortgage has this priority to the same extent as the construction mortgage."

On the other hand, if we hold the pipe to be goods,[7] but not a fixture, FCSCC would have the only valid security interest in the pipe under exclusive application of the U.C.C. § 34–21–904, W.S.1977 (Cum.Supp. 1987).

## STANDARDS OF REVIEW

Our well-established standard of review of an order granting summary judgment is that:

---

struments, accounts, chattel paper, general intangibles, contract rights and other things in action. 'Goods' also include the unborn young of animals and growing crops * * *."

**5.** Section 34–21–942(a)(ii), W.S.1977 (Cum. Supp.1987), provides:

"A 'fixture filing' is the filing in the office where a mortgage on the real estate would be filed or recorded of a financing statement covering goods which are or are to become

fixtures and conforming to the requirements of W.S. 34–21–951[ (e) ] (9–402(5))."

**6.** Section 34–21–942(a)(iii), provides:

"A mortgage is a 'construction mortgage' to the extent that it secures an obligation incurred for the construction of an improvement on land including the acquisition cost of the land, if the recorded writing so indicates."

**7.** See supra note 4.

"A motion for summary judgment places an initial burden on the movant to make a prima facie showing that no genuine issue of material fact exists and that summary judgment should be granted as a matter of law. Rule 56(c), Wyoming Rules of Civil Procedure. Once a prima facie showing is made, the burden shifts to the party opposing the motion to present specific facts showing that a genuine issue of material fact does exist. *England v. Simmons*, Wyo., 728 P.2d 1137, 1140–1141 (1986). We analyze challenges to a grant of summary judgment by reviewing the record in a light most favorable to the party opposing the motion giving him all favorable inferences that can be drawn from the facts. * * * " *Boehm v. Cody Country Chamber of Commerce*, Wyo., 748 P.2d 704, 710 (1987).

When the issue involves determining whether chattels become fixtures we have stated that:

" * * * Whether a chattel is a fixture or has in any case become a part of the realty is a mixed question of law and fact, and is to be determined from a consideration of all the facts and circumstances attending its annexation and use. [Citation.] * * * " *Anderson v. Englehart*, 18 Wyo. 409, 108 P. 977, 979 (1910).

As the Board points out in the opening paragraph of its brief, the facts in this case are not in dispute. Our review of the Board's issue is, therefore, confined to review of the trial court's *application* of the law of fixtures to those facts.

## WYOMING LAW OF FIXTURES

◼ The logical starting point to analyze the Board's issue is § 34–21–942(a)(i), W.S. 1977 (Cum.Supp.1987), which provides:

"Goods are 'fixtures' when they become so related to particular real estate that an interest in them arises under real estate law."

This court has not had occasion to discuss this aspect of the law of fixtures for nearly forty-eight years. See School District No. II, *Laramie County v. Donahue*, 55 Wyo. 220, 97 P.2d 663, 664 (1940). When

presented with this issue, however, we still rely on the three-part test first set forth in the landmark case of *Teaf v. Hewitt*, 1 Ohio St. 511, 525 (1853):

"It has been said upon abundant authority that, generally speaking, the proper criterion of an irremovable fixture consists in the united application of three tests, viz:

" '1st. Real or constructive annexation of the article in question to the realty.

" '2d. Appropriation or adaptation to the use or purpose of that part of the realty with which it is connected.

" '3d. The intention of the party making the annexation to make the article a permanent accession to the freehold, this intention being inferred from the nature of the article affixed, the relation and situation of the party making the annexation and policy of the law in relation thereto, the structure and mode of the annexation and the purpose or use of which the annexation has been made.' [Citations.] * * * " *Holland Furnace Co. v. Bird*, 45 Wyo. 471, 21 P.2d 825, 827–828 (1933).

Although all three parts of this test bear upon classification of chattels as fixtures in any given case, we follow a majority of jurisdictions in placing the most emphasis on the intention of the person making the annexation. *Holland Furnace Co. v. Bird*, supra at 828; Squillante, *The Law of Fixtures: Common Law and the Uniform Commercial Code, Part I: Common Law of Fixtures*, 15 Hofstra L.Rev. 191, 195, 201 n. 69 (1987). This intention does not refer to the annexor's subjective state of mind; rather, it is the objective intention the law can infer an ordinary reasonable person to have based on the facts and circumstances in the record. *Holland Furnace Co. v. Bird*, supra, at 827–828; and *Boothbay Harbors Condominiums, Inc. v. Department of Transportation*, Me., 382 A.2d 848, 854 (1978). Circumstances bearing on a determination of objective intent include the nature of the article affixed, the way it was affixed, the purpose it serves on the land and the annexor's relationship to the article and to the land. *Lib-*

*erty Lake Sewer District No. 1 v. Liberty Lake Utilities Company, Inc.,* 37 Wash. App. 809, 683 P.2d 1117, 1120 (1984).

■ We first hold that the gated pipe has never undergone a *real* annexation to the irrigated land. It was attached to the riser pipes only intermittently during each irrigation season.

Whether there has been a *constructive* annexation depends on the following standard:

" ' * * * [C]onstructive annexation may be found where the objects, although not themselves attached to the realty, comprise a necessary, integral or working part of some other object which is attached * * * [Citation]." *Rayl v. Shull Enterprises, Inc.,* 108 Idaho 524, 700 P.2d 567, 571 (1984).

Constructive annexation must also be considered in light of the three-part fixture test, which stresses that affixation to the land be permanent in character. *Holland Furnace Co. v. Bird,* supra, at 827–828. A good example of an article that is constructively annexed to realty is a house key. The key is not permanently attached to the house, but when in physical contact, is a necessary and integral part of the house as a permanent fixture on the land. *Apart from the house,* the key has little or no value. See Squillante, *Common Law of Fixtures,* supra, at 206–208.

The gated pipe in this case arguably does not have the same kind of relationship to the property as the key does to the house. It is possible that the land could be irrigated without it, and the record is unclear whether other types of irrigation pipe, i.e., sprinkler pipe, could be attached to the rise pipes in the Rumerys' field. The gated pipe is also readily marketable at a substantial value when separated from the land.

The Board's argument on part two of the fixture test is that the pipe is necessary for irrigating the Rumerys' semi-arid land, and because irrigating the Rumerys' land increases its value, the pipe is adapted to that use. On its face this argument is logical, taken to its ultimate conclusion; however, it is flawed. Strong reliance on

this kind of adaptation argument as evidence of an annexor's intent would allow the Board to classify any item on the farm "necessary" for irrigation of the land receiving water from the rise pipes as a fixture. This flaw in placing heavy reliance on the adaptation test was recognized long ago in *Teaf v. Hewitt,* supra, at 529:

"This rule is in conflict with those authorities which make the mode of the physical annexation the test, and it will not bear examination as a criterion of general application. *If adaptation and necessity for the use and enjoyment of the realty, be the sole test of a fixture, then the implements and domestic animals necessary for the cultivation of a farm, and a great variety of other articles subject to the use of the land or its appurtenances, which never have been and never can be recognized as such, would be fixtures.* It would utterly confound the rule by which the rights of the vendor and vendee, heir and executor, & c., have been heretofore governed." (Emphasis added.)

The real question here is whether the Rumerys showed sufficient objective intent to make the pipe a fixture. Arguably the pipe could be viewed as being both constructively annexed to the irrigated land and adapted to use on the land. Such conclusions, when viewed in light of our search for the Rumerys' objective intent to make the pipe a fixture, however, are of little value. Further, the intent we can infer from the character of the pipe itself is weak. The pipe is specifically designed to be portable and useful in any field with a suitable water hook-up. It is stored on a trailer away from the irrigated land in winter, and has immediate value apart from the land.

The Board counters these conclusions by citing the case of *Johnson v. Hicks,* 51 Or.App. 667, 626 P.2d 938 (1981), for the proposition that the constructively annexed portion of an irrigation system is a fixture. The irrigation pipe at issue in that case, however, was a partially buried portion of the water mainline that fed water to portable sprinkler pipes. Id., at 939, n. 4. Con-

sequently, that case is not on point, and our research finds no other cases directly supporting the Board's assertion.

The most convincing evidence of objective intent in this case can be inferred from the way the Rumerys treated the pipe in financial transactions. The two security agreements are illustrative. The 1969 security agreement created an interest in after acquired farm and ranch machinery and equipment as personalty apart from the land. The 1985 security agreement expressly listed the gated pipe similarly as equipment securing their debt to WPCA on a second security agreement.

Viewing all of this evidence together, we can only conclude that the Rumerys never showed an objective intent to make the pipe a fixture. Because the pipe is not a fixture, FCSCC has priority to it under the security agreements.

Affirmed.

URBIGKIT, J., filed a dissenting opinion.

URBIGKIT, Justice, dissenting.

I differ from the majority in their dispositive conclusion that the gated pipe, as part of the farm-loan-purchased, state-funded irrigation system, was not a fixture. The decision is erroneous in advancement of an after-acquired property clause as a personalty mortgage concept in affording a prior security interest to Farm Credit System Capital Corporation (FCSCC) over an asset purchased by a Wyoming State Farm Loan Board (Board) loan. In application of more modernized concepts, my analysis affords the real estate property fixture criteria to the mortgage security given as collateral for the state-financed-farm-real-estate improvement as an irrigation system in the arid west.

My dissent is based on two foundations: (1) the relationship of the parties in the transaction as shown through the evidence to be a purchase money mortgage which should deny partial summary judgment for the dragneting operational funding chattel security lender by demonstrating an intent to install and finance as a fixture (transactional status); and (2) the entity concept which alternatively would require rejection

of the summary judgment (unit fixture status). For this court's analysis of summary judgment see: *Cordova v. Gosar,* Wyo., 719 P.2d 625, 719 (1986) and *Davenport v. Epperly,* Wyo., 744 P.2d 1110 (1987). For interesting discussions of the purchase money mortgage in relation to fixtures, see: Shanker, *An Integrated Financing System For Purchase Money Collateral: A Proposed Solution To The Fixture Problem Under Section 9–313 Of The Uniform Commercial Code,* 73 Yale L.J. 788 (1964), and Gilmore, *The Purchase Money Priority,* 76 Harv.L.Rev. 1333 (1963).

Factually, this case is the converse of the normal contest between the holder of the broad real estate mortgage and contestee chattel financier who supplied the funding for the installed property. Here, the holder of the real estate mortgage funded the purchase and installation of the irrigation system and the chattel lender provided no part of the consideration for acquisition of the improvement asset against which it seeks to impress a prior lien by dragnet or anaconda characteristics found within its loan documents. For a general discussion of the nature of the anaconda or dragnet clauses, see *First National Bank, Cortez v. First Interstate Bank, Riverton,* Wyo., 758 P.2d 1026 (1988).

The policy of the Uniform Commercial Code (UCC) to afford priority to the party supplying purchase money financing is consequently frustrated. See Gilmore, supra at 1371 and Comments to the UCC § 9–312 as that section is now found as § 34–21–941, W.S.1977 (1987 Cum.Supp). See also § 34–21–907, W.S.1977 (UCC § 9–107), which defines a purchase money security interest. The unsettled nature of the subject of when does personal property become a fixture is identified in Coogan, *Fixtures—Uniformity In Words Or In Fact?,* 113 U.Pa.L.Rev. 1186 (1965) and his earlier analysis, Coogan, *Security Interests In Fixtures Under The Uniform Commercial Code,* 75 Harv.L.Rev. 1319 (1962).

## I. MODERN STATUS OF FIXTURE SECURITY LAW

The statement in the majority's opinion that this court has not discussed the law of

fixtures for nearly 48 years is not wholly complete. While the discussion has not been extensive, fixtures did play a part at least tangentially in several cases during this supposed dormant period. See *Tri-State Nat. Bank v. Saffren*, Wyo., 726 P.2d 1081 (1986); *Sannerud v. First Nat. Bank of Sheridan*, Wyo., 708 P.2d 1236 (1985); *Security Bank and Trust Co. v. Blaze Oil Co.*, Wyo., 463 P.2d 495 (1970); *Hill v. Salmon*, 69 Wyo. 1, 236 P.2d 518 (1951); and *Rosenblum v. Terry Carpenter, Inc.*, 62 Wyo. 417, 174 P.2d 142 (1946). The subject of fixtures has been twice addressed by the Wyoming Law Journal: Rudolph, *Secured Transactions Under the Commercial Code*, 14 Wyo.L.J. 220, 229 (1960) and Note, *Some Aspects of the Law of Fixtures in Wyoming*, 10 Wyo.L.J. 119 (1956). Excluding the case of *Holland Furnace Co. v. Bird*, 45 Wyo. 471, 21 P.2d 825 (1933), earlier Wyoming litigation more frequently involved trade fixtures and improvements which come into controversy at the end of a leasehold term. *Laramie County, School Dist. No. 11 v. Donahue*, 55 Wyo. 220, 97 P.2d 663 (1940); *Slane v. Curtis*, 41 Wyo. 402, 286 P. 372 (1930); *Slane v. Curtis*, 39 Wyo. 1, 269 P. 31 (1928). The exceptions being the somewhat similar circumstances to this case resulting from mortgage foreclosure in *Federal Land Bank of Omaha v. Sells*, 40 Wyo. 498, 280 P. 98 (1929) and *Anderson v. Englehart*, 18 Wyo. 409, 108 P. 977 (1910), where the notice of the improvements included whether the mortgage coverage was persuasively comparable.

Moreover, I would today find the majority's reliance on the three-part test of a fixture taken from *Teaff v. Hewitt*, 1 Ohio St. 511, 525 (1853)[1] to be insufficient as too rigid and constraining around which to mold an informed twentieth century analysis of fixtures. The current California approach to the concept of fixtures is found to be more appropriate in today's world of business transactions because it is more expanded and reflective of the precarious nature of fixtures which, at times, lie in the "twilight zone between things real and things personal." See *Frost v. Schinkel*, 121 Neb. 784, 238 N.W. 659, 664 (1931). California utilizes four conjunctive tests to determine whether or not an article is a fixture.

"The first test is the manner of the article's annexation to the realty. [Citations omitted.] The second test is the article's adaptability to the use and the purpose for which the realty is used. [Citations omitted.] The third test is the intention of the party making the annexation. [Citations omitted.] The fourth test is the relation of the parties to the annexed property. [Citations omitted.]" *In Re Arlett*, 22 B.R. 732, 734 (E.D.Cal.1982). See also *Kruse Metals Mfg. Co. v. Utility Trailer Mfg. Co.*, 206 Cal.App.2d 176, 23 Cal.Rptr. 514, 518 (1962).

We will consider the tests in converse order as a relative demonstration of basic importance.[2] See *Planter's Bank v. Lum-*

---

**1.** As noted in *Western Ag Land Partners v. State Dept. of Revenue*, 43 Wash.App. 167, 716 P.2d 310, 312 n. 2 (1986):

"White and Summers present two other 'objective,' although unheralded, tests to determine whether an item is a fixture: the 'half-inch formula' and the 'screwdriver-crescent-wrench-one-hour' rule. J. White & R. Summers, *Uniform Commercial Code* 1056 n. 66 (2d ed. 1980). Under the former, 'anything which could be moved more than a half inch by one blow with a hammer weighing not more than five pounds and swung by a man not more than 250 pounds would not be a fixture.' Under the latter, anything would be deemed a fixture unless one could loosen the item from the floor or wall with a screwdriver and a crescent wrench within one hour. While we do not endorse either test, we question whether the [central pivot irrigation sys-

tem] could be moved more than a half inch by such a hammer blow. On the other hand, it may be possible to loosen the main arm from the cement pivot within an hour. Even the 'objective' tests fail in providing a clear determination whether an item is a fixture."

**2.** The Teaff criterion and modern test of general application are not especially antagonistic since criteria of the former included a sub-definition to define inference of intent:

"'* * * from the nature of the article affixed, the relation and situation of the party making the annexation, the structure and mode of annexation, and the purpose or use for which the annexation has been made.' * * *." *Beebe v. Pioneer Bank & Trust Co.*, 34 Idaho 385, 201 P. 717, 718 (1921), quoting *Boise–Payette Lumber Co. v. McCornick*, 32 Idaho 462, 186 P. 252 (1919).

*mus Cotton Gin Co.,* 132 S.C. 16, 128 S.E. 876, 878 (1925) as an earlier analysis to now be in essential concurrence with the modern rule as it quoted *Montague v. Dent,* 10 Rich.Law, 135, 67 Am.Dec. 573 in stating:

> " 'So various are the considerations which enter into the interpretation of the law fixtures, dictating varying and opposite conclusions as to the same or like articles, which may become the subject of controversy, that an adjudicated case may fail to be of any authority, where the subject-matter of contest may be the same, *as the particular case must be considered with reference to the relation of parties.* * * * ' " (Emphasis in original.) *Planter's Bank v. Lummus Cotton Gin Co.,* supra, 128 S.E. at 878.

## II. RELATION OF THE PARTIES TO THE PROPERTY TO WHICH THE CHATTEL IS ANNEXED AND FOR WHICH THE CHATTEL WAS ACQUIRED

The majority concedes it only looks at the application of the law because the facts are not in dispute; however, in doing so the majority loses sight of the unique circumstances of the individual case requiring separate analysis to determine whether a tangible personal property has become a fixture when used to serve a real estate purpose. Clearly, whether an item is a fixture is a mixed question of law and fact to be determined on the evidence presented in each individual case. *Anderson v. Englehart,* supra, 108 P. at 979; *Corning Bank v. Bank of Rector,* 265 Ark. 68, 576 S.W.2d 949, 952 (1979); *Rayl v. Shull Enterprises, Inc.,* 108 Idaho 524, 700 P.2d 567, 570 (1984); *Cook v. Beermann,* 201 Neb. 675, 271 N.W.2d 459, 461 (1978), modified by 202 Neb. 447, 276 N.W.2d 84 (1979); *Western Ag Land Partners v. State Dept. of Revenue,* 43 Wash.App. 167, 716 P.2d 310, 311 (1986); *Nearhoff v. Rucker,* 156 Wash. 621, 287 P. 658, 661 (1930). The majority's analysis of analogizing a key as possibly being annexed to the realty only underscores the need to fully develop and examine *each* individual case by a jury.[3] Unless the security agreement evidences a clear intent, summary judgment is rarely justified when dealing with the issue of whether goods have become fixtures since the inquiry is fact dependent and "more for the jury than for the court." See *Frost v. Schinkel,* supra, 238 N.W. at 670–671; and 9 Hawkland, *Uniform Commercial Code Series,* § 9–313:02, at 206–207 (1986). One cannot blindly ignore the facts of this case and uphold the partial summary judgment when weighing of facts is required for decision.

> " '3d. The intention of the party making the annexation to make the article a permanent accession to the freehold, this intention being inferred from the nature of the article affixed, the relation and situation of the party making the annexation and the policy of the law in relation thereto, the structure and mode of the annexation and the purpose or use for which the annexation has been made.' " Quoting Ewell on Fixtures (2d Ed.) 27–28. The Wyoming court did not ask about the utility of an Evanston, Wyoming house without heat in the winter but did give consideration to repayment to the property purchaser for the "value" of the removed coal furnace.

Actually, the modern approach, as defined in more organized enumeration by the California rule, deletes subsidiary inferences in deriving the four aspect inquiry. See *Far West Modular Home Sales, Inc. v. Proaps,* 43 Or.App. 881, 604 P.2d 452 (1979). This adaptation encompasses the "elaboration of the [three point] test" to be applied to the facts of the case as is further enumerated in *Holland Furnace Co. v. Trumbull Savings & Loan Co.,* 135 Ohio St. 48, 19 N.E.2d 273 (1939), where the warm air furnace became a fixture by slight physical attachment in pursuance of the situation and surrounding test. See discussion of inference from the relationship of the parties to determine intent, Squillante, *The Law of Fixtures: Common Law And The Uniform Commercial Code,* 15 Hofstra L.Rev. 191, 222 (1987).

This case requires comparison with the earlier Wyoming case, *Holland Furnace Co. v. Bird,* supra, 45 Wyo. at 479–480, 21 P.2d 825, where the identical Teaff rules were cited and the exact opposite result achieved as the third intent principle is stated:

3. "A carpet is not a fixture although nailed to the floor, and a key carried in the vest pocket may be a part of the realty, therefore each particular case of fixtures must be determined by its own facts and is more for the jury than for the court. * * * " *Frost v. Schinkel,* supra, 238 N.W. at 670–671.

The facts show that the Board unquestionably had a purchase money mortgage in the pipe by providing the money for purchase and taking a real estate mortgage on the property and installed irrigation system. The record demonstrates that on January 24, 1978, the Board loaned the Rumerys $87,000 for the specific purpose of purchasing and installing an irrigation system on their farm property. This acquisition of an irrigation system included the gated pipe and the entire system was a real estate improvement. The majority glosses over the relationship of the parties and totally disregards it apparently in favor of simplicity sake by applying one rule to all relationships concerning whether a chattel has become a fixture. However, the area of fixtures is complex because of the various relations which can arise. Simply stated, the same rule regarding fixtures cannot apply to all parties across the board without regard for the variant relationships that may exist. *Planter's Bank v. Lummus Cotton Gin Co.*, supra. As Judge Thornton dissenting in *Far West Modular Home Sales, Inc. v. Proaps*, 43 Or.App. 881, 604 P.2d 452, 456 (1979) astutely phrased the law:

> "Whether or not an article annexed to the real property is a fixture is a question of fact to be determined upon the evidence in a particular case, and the question is determined not only by the manner in which the article is affixed to the realty, *but also by the relationship of the parties to the controversy. Bell v. Bank of Perris*, 52 Cal.App.2d 66, 125 P.2d 829, 833 (1942)." (Emphasis added.)

The relationship of the parties is also important because when an owner or mortgagor attaches a tangible item to real estate, a presumption arises that it was annexed with the intention of enriching the freehold and thus, it becomes a part of the realty. *Energy Control Services, Inc. v. Arizona Dept. of Economic Sec.*, 135 Ariz. 20, 658 P.2d 820, 823 (1982); *Corning Bank v. Bank of Rector*, supra; *Frost v. Schinkel*, supra; *Planter's Bank v. Lummus Cotton Gin Co.*, supra; *Western Ag Land Partners v. State Dept. of Revenue*, supra; *Nearhoff v. Rucker*, supra; *Hall v. Dare*, 142 Wash. 222, 252 P. 926, 928 (1927). Consequently, with no evidence to rebut the presumption which derived from the relationship of the parties in the evidentiary material supporting the partial summary judgment motion, it was improvident to grant summary judgment at this stage.

The manner and circumstance of installation principles should not be ignored as has been done by this court in majority opinion. See *Hall v. Dare*, supra. Irrigation pipe is not unnoticed in fixture litigation. *Energy Control Services, Inc. v. Arizona Dept. of Economic Sec.*, supra; *Rayl v. Shull Enterprises, Inc.*, supra; *Johnson v. Hicks*, 51 Or.App. 667, 626 P.2d 938 (1981), as a solar water heating system; *Western Ag Land Partners v. State Dept. of Revenue*, supra, 716 P.2d 310.

### III. INTENTION

The majority determines that the Rumerys had no objective intent to treat the pipe as a fixture because of its treatment in financial transactions as "equipment." Support for this conclusion is not to be found factually from this record as demonstrated by the purchase money nature of the original transaction.[4] However, equipment can also be a fixture. 2 Alderman and Dole, *A Transactional Guide To The Uniform Commercial Code*, § 7.14, at 906 (2d ed. 1983). As well, the objective intent is derived at the time of annexation.

"* * * Neither the intention existing at the time of procuring the article nor that

---

4. In the nature of complex default and resale problems, a careful lender nearly always takes a security agreement and financing statement for purchase money security purposes to avoid argument and contest. Flag poles and light switch plates are known to disappear. However, little question can rationally be derived in this case but that the Board desired to leave no security assets unencumbered for which state loan funds had been provided for purchase. At most, the transaction shows a mistake in administrative and legal draftsmanship by omission of extraordinary care, not in denied intent or demonstrated satisfactory draftsmanship. See recommendation of 24 years ago in Shanker, supra, 73 Yale L.J. at 798, recommending the use of both the real estate and chattel security documentation.

which exists while the same is being transported to the real property where it is designed to be placed, nor the secret plan in the mind of the person making the annexation, govern. The controlling intention is that which the law deduces from all of the circumstances of the installation of the article upon the land. * * * " *First State & Savings Bank v. Oliver,* 101 Or. 42, 198 P. 920, 922 (1921) citing *Roseburg Nat. Bank v. Camp,* 89 Or. 75, 173 P. 313, 315 (1918).

See also *Rayl v. Shull Enterprises, Inc.,* supra and *Johnson v. Hicks,* supra. Thus, it is irrelevant how the parties treated the pipe in 1969 and 1985 since the loan was made in 1978. It is the intent when purchase was made by state loan funds that is now significant. A similar argument is unpersuasive that even if ordinarily the chattels would be considered fixtures, they lost that character by the fact the Rumerys had previously executed chattel mortgages on personal property. The Washington supreme court disposed of this argument as not applicable in a similar situation in *Parrish v. Southwest Washington Production Credit Ass'n,* 41 Wash.2d 586, 250 P.2d 973, 975–976 (1952). See also *Planter's Bank v. Lummus Cotton Gin Co.,* supra, 128 S.E. at 881. Therefore, intent is to be determined at the time of installation and the circumstances of any previous or subsequent treatment is not meaningful as to the purchase money lender in characterization whether the pipe was a fixture upon acquisition and installation.

## IV. ADAPTABILITY

The majority finds that the Board's argument is logical, but flawed when taken to its ultimate conclusion because of the heavy reliance on this part of the test to determine whether the pipe is a fixture. However, no "heavy reliance" needs to be given in this case when the facts are properly analyzed. Additionally, this is not and should not be the *sole* criterion to determine when a chattel has become a fixture. " * * * The question most frequently asked is whether the real property is peculiarly valuable in use because of the continued presence of the annexed property thereon. [Citations omitted.] Thus, it has been said that an object placed on the realty may become a fixture if it is a necessary or at least a useful adjunct to the realty, considering the purposes to which the latter is devoted. This principle, variously referred to as the 'adaptability test' or the 'integrated industrial plant doctrine' or 'institution doctrine,' is often given great weight in determining whether a particular object has assumed the status of a fixture. [Citations omitted.]" *Seatrain Terminals of California, Inc. v. Alameda County,* 83 Cal. App.3d 69, 147 Cal.Rptr. 578, 582 (1978).

The gated pipe in the instant case is undeniably necessary to allow the irrigation system to be utilized. Certainly, if this pipe was not used, some other pipe would need to be attached to make the irrigation system operative on the farm. Thus, the pipe is absolutely necessary to the operation of the present system to achieve the goal of bringing irrigation to this semi-arid piece of farm land. See *Frost v. Schinkel,* supra, 238 N.W. at 671. In accord with this result, see *Ver Plank v. Bouwens,* 6 Misc.2d 965, 164 N.Y.S.2d 596, 598 (1957), where the court pointed out:

"Regarding the pumps in the house, I reach the same conclusion. Without the pumps, the water supply in the house would not work, except for a small hand pump that was also located in the house. Again, while these pumps could be removed without injury to the pumps or to the real property, I find that they were annexed with the intention of permanently improving the property in such a manner as to become fixtures."

The entire entity which included the gated pipe became a fixture since all the components are indispensable parts of the operative system. Without question, the property, because of the presence of the irrigation system which is at least a useful adjunct to the realty, is peculiarly more valuable than dry farm land. See *Rayl v. Shull Enterprises, Inc.,* supra, 700 P.2d 567. The adaptation required to be shown is amply demonstrated when considering from a

common sense [5] perspective alone the great enhancement of value in land in Wyoming occasioned by the availability of water.

## V. ANNEXATION

While the majority recognizes that a constructive annexation can occur, they conclude that the required permanence is not shown with the gated pipe because of its mobility. Although the majority analysis never specifically holds that a constructive annexation did not occur, they do " * * * hold that the gated pipe has never undergone a *real* annexation to the irrigated land. It was attached to the riser pipes only intermittently during each irrigation season." In other words, the majority characterizes either a constructive or actual annexation as a "real" annexation based upon the intent of the parties as evidenced by the mobility of the chattel. However, the court in *Seatrain Terminals of California, Inc. v. Alameda County*, supra, 147 Cal.Rptr. at 583 when faced with this issue pointed out:

> "Appellant's next contention that the movability of the cranes demonstrated that they were not intended to be permanent installations, is likewise ill-founded. As repeatedly emphasized in cases, permanence is to be distinguished from perpetuity. In order to make an article a permanent accession to the realty, its annexation need not be perpetual. It is sufficient if the article appears to be intended to remain where fastened until worn out, until the purpose to which the realty is devoted has been accomplished, or until the article is superseded by another article more suitable for the purpose. [Citations omitted.] * * * "

Furthermore, the Oregon court of appeals has recognized:

> "Since there is no requirement that a chattel actually be attached to the real property to satisfy the annexation test, *Marsh v. Boring Furs, Inc.,* supra, 275 Or. at 582, 551 P.2d 1053, testimony illus-

trating the ease with which the modular home could be removed is not controlling. * * * " *Far West Modular Home Sales, Inc. v. Proaps,* supra, 604 P.2d at 454.

Whether a good is seasonally removed to protect it from the weather is not controlling whether the chattel was intended to be permanently attached to the realty so as to become a fixture.

> "The first requirement of a fixture, set out in *Teaff v. Hewitt,* supra, is actual annexation to the freehold. But the exceptions are numerous. Doors, windows, shutters are often hung but not fastened to a building, and *at certain seasons may be stored elsewhere,* yet they are a part of the real estate; and in *Roderrick v. Sanborn,* 106 Me. 159, 76 A. 263, 30 L.R.A. (N.S.) 1189, 20 Ann.Cas. 469, it is held they will pass under a mortgage. Retention by gravity is sufficient. * * * " (Emphasis added.) *Frost v. Schinkel,* supra, 238 N.W. at 670.

" * * * This requirement of permanence does not mean that the goods *cannot* be removed; rather, that they are *intended not to be* removed." (Emphasis in original & footnote omitted.) 9 Hawkland, supra, § 9–313:02, at 206. Thus, the majority improperly concentrates on the fact that the pipe in this case can be removed, and concludes from that fact that it was not intended to be a permanent annexation. However, this limited view does not distinguish between the kinds of mobility that can be present when dealing with chattels in today's world. There is a

" * * * definite distinction between generalized and localized mobility, and equipment with the latter properties has consistently been held to constitute fixtures. For example, in *Titus v. Poland Coal Co.,* supra, 119 A. 540, pit cars used in a coal mine which, similar to the railroad wagons, moved on embedded rails were held to be fixtures because they performed a function of a localized rather

---

5. " ' * * * As suggested by Lindley, L.J., in the case of Viscount Hill v. Bullock, 2 Chancery 482, where it was claimed certain stuffed birds were fixtures: "After all there is such a thing as common sense, and it must be

brought to bear upon the question of whether these birds are or are not fixtures." ' " *Beebe v. Pioneer Bank & Trust Co.,* supra 201 P. at 719, quoting *Boise–Payette Lumber Co. v. McCornick,* supra.

than a general nature. In *United Pacific Ins. Co. v. Cann*, supra, 129 Cal.App. 2d 272, 276 P.2d 858, in a comparable situation, a cradle which ran on tracks by use of a cable attached to an electrically operated winch and thus had only limited mobility was also held to be a fixture. * * * " *Seatrain Terminals of California, Inc. v. Alameda County*, supra, 147 Cal.Rptr. at 584.

The irrigation pipe in the instant case has localized mobility in that the evidence revealed that the pipe was removed and placed in a shelter each fall and replaced in the spring. With the localized mobility of the pipe, the characteristic of removal cannot defeat the permanence of annexation. Moreover, the value of the pipe when removed is not an indicia of whether it has become a fixture.

"* * * It is true that the machinery was such as is used in other laundries, and that it was not made for, or specially adapted to, this building. But in the language of Mr. Justice Van Syckel in *Feder v. Van Winkle*, supra, [53 N.J.Eq. 370, 372, 33 A. 399, 51 Am.St.Rep. 628] neither is the fact that the things in question may be removed and sold for other uses, or that they were not made for special adaptation to the building in which they were placed, decisive of their character. Those qualities are mere circumstances to be considered, and the mere presence of them does not necessarily withdraw machinery from the real estate mortgage. * * * " *Atlantic Safe D. & T. Co. v. Atlantic City Laundry Co.*, N.J., 53 A. 212, 213 (1902).

Consequently, the analysis in this case cannot rest alone on the movability of the gated pipe.

The persuasion of the majority in considering annexation is also faulty in failing to recognize the entity concept of annexation. In *First State & Savings Bank v. Oliver*, supra, 198 P. at 923, the court discussed the non-novel concept in quoting 19 Cyc. 1045:

"'* * * if the realty is equipped with a complicated plant, some of which is so attached to the realty as to be a part thereof, and some not physically annexed, then on a transfer of the realty the entire plant is transferred, including the unattached parts, on the principle whereby an indispensable part of a machine is transferred.'"

This is the entity theory of fixture annexation which equally applies to the gated pipe as used in the irrigation system. Without the pipe, the pump riser and delivery system become meaningless.

"It is the trend of judicial opinion to regard all of those things as fixtures which have been attached, whether physically or constructively, to the realty, with a view to the purposes for which the real property is held or employed, however slight or temporary the connection between the articles and the land. * * * " *First State & Savings Bank v. Oliver*, supra, 198 P. at 922.

See the similar rule application for the cranberry bog irrigation system as an integrated entity in which priority was denied to the Washington PCA chattel mortgage in *Parrish v. Southwest Washington Production Credit Ass'n*, supra, 250 P.2d 973 and the monorail system in *Nearhoff v. Rucker*, supra, 287 P. 658.

In application of the integrated or entity doctrine, I would certainly find an issue as a question of fact whether the jury might determine that the gated pipe portion of the irrigation system "while retaining its separate physical identity, is so connected with the realty that a disinterested observer would consider it a part thereof." See 5 American Law of Property, § 19.1, at 3–4 (1952). Cf. White and Summers, *Uniform Commercial Code*, § 25–8, at 1054 (2d ed. 1980).

## VI. CONCLUSION

From the annexation of the pipe, its adaptability, the intention of the parties, and especially the relation of the parties to this transaction, it is apparent that the pipe was meant by the lender (the state) and the borrower (the farmer) to be a permanent accession to the freehold in irrigation system usage. Otherwise, by legal concept and factual fiction, we would cannibalize

the system from switch plate to valve. The court misapplies a mixed issue of fact and law ascertainment to justify entry of summary judgment. Furthermore, the decision gives a windfall to the undeserving chattel security lender from an asset purchased by use of trust funds loaned from resources of the people of the State of Wyoming to improve farm land values. I cannot find a sufficiently egregious mistake by administrators and lawyers of the state in loan documentation so that this is required to happen.

The partial summary judgment was improvidently granted and should be reversed.