No. 98-729

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 194

295 Mont. 384

983 P.2d 988

MARVIN G. SCHWEND,

Plaintiff and Appellant,

v.

ALBERT SCHWEND, et al.,

Defendants and Respondents.

CHARLES SCHWEND,

Plaintiff and Appellant,

v.

ALBERT SCHWEND, et al.,

Defendants and Respondents.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Carbon,

The Honorable G. Todd Baugh, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Edward A. Murphy, Datsopoulos, MacDonald & Lind, P.C.;

Missoula, Montana

For Respondents:

Robert C. Smith, Cavan & Smith; Billings, Montana

Joseph V. Womack, Waller & Womack; Billings, Montana

Submitted on Briefs: April 29, 1999

Decided: August 19, 1999

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

1. ¶Plaintiffs Marvin and Charles Schwend filed separate actions in the Thirteenth Judicial District Court for Carbon County, in which they sought the dissolution of a family ranching partnership and the distribution of its assets. The actions were consolidated, and the parties executed a property settlement agreement, which provided for the distribution of the partnership assets. Marvin and Charles then filed separate motions to enforce the terms of the agreement related to the ownership of certain irrigation pipe and the division of certain ranch property. They now appeal the District Court's order in favor of the defendants, Albert, Dan, and Les Schwend. We affirm the judgment of the District Court.
2. ¶The issues on appeal are:
3. ¶1. Did the District Court err when it concluded that the movable irrigation pipe removed from the Jones property was personal property or equipment allocated to Dan and Les Schwend by the terms of the settlement agreement?
4. ¶2. Did the District Court err when it adopted a subdivision survey which allocated 2.086 acres of real property to Les Schwend?

## FACTUAL BACKGROUND

1. ¶Marvin and Charles Schwend filed separate actions for the dissolution of the Albert Schwend and Sons partnership, a family ranch with assets consisting of real property and ranch equipment located in Carbon County. The parties reached a settlement of those claims in December 1997.

1. ¶The Settlement Agreement and Mutual Release, dated December 24, 1997, distributed the ranch assets among Marvin, Charles, Dan, and Les Schwend (Albert Schwend died prior to the execution of the settlement agreement). For purposes of this appeal it is sufficient to note that the agreement transferred several of the ranch's real property parcels, including the "Jones Place," to Marvin and Charles. Les occupied a house and curtilage ("Tract 1") on the Jones Place, which was therefore to be subdivided from the agricultural land. The remainder of the ranch properties and equipment went to Dan and Les. The specific provisions of the property settlement agreement relevant to this appeal provide:

2. The real property generally described in Exhibit A and all equipment and machinery and all brands of the Albert Schwend and Sons Partnership are the subject of these proceedings, and shall, subject to the terms of this agreement, be divided between the parties as follows:

(a) To Marvin and Charles as tenants in common: . . . all of Tract A - the Jones Place, less the land given to Les and Dan described in 2b) below . . . .

b) To Les and Dan or those taking by, through or under them: Les's home place being approximately 2 acres, more or less, located in the Northwest corner of Tract A - Jones Place (with the boundary of said property defined by the existing hedge plus 10 feet) . . . and all machinery and equipment, the brands, and all other assets of the Albert Schwend and Sons Partnership . . . .

1. ¶The irrigation system at issue consisted of an underground main line to which segments of plastic and aluminum irrigation pipe could be attached at various points. The above ground segments could be picked up and moved by one man. After the execution of the agreement, Marvin marked the pipe, which was stacked for the winter on the Jones property, with paint. Dan and Les later removed that pipe from the Jones Place. They did not disturb any of the underground portion of the irrigation system.
2. ¶Les also established boundaries for Tract 1, which was to be subdivided from the

remainder of the Jones Place for his home. The boundary lines for the property were 10 feet beyond the hedges which framed Tract 1 on three sides, but extended approximately 150 feet beyond the terminus of the hedges on the fourth side of the property. Les testified that the area included in the survey was necessary for a drain field for the property. He further testified that he was required by the county to maintain a drain field of a minimum size, and that he had Tract 1 resurveyed three times in order to arrive at the closest possible acreage which would both accommodate the required drain field and satisfy the property settlement agreement.

3. ¶Marvin and Charles brought motions before the District Court in which they requested that the District Court order the return of the irrigation pipe and that it order that the border of Tract 1 on the side of the property where there was no hedge, be drawn between two points extending 10 feet beyond the terminus of the hedges. The District Court denied the motions and this appeal followed.

## ISSUE 1

1. ¶Did the District Court err when it concluded that the movable irrigation pipe removed from the Jones property was personal property or equipment allocated to Dan and Les Schwend by the terms of the settlement agreement?

2. ¶Marvin and Charles contend that the District Court erred when it concluded that the irrigation pipe was not a fixture, pursuant to § 70-15-103, MCA. We review a district court's conclusion of law for correctness. *See Carbon County v. Union Reserve Coal Co.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686.

3. ¶Marvin and Charles contend that because the irrigation pipe removed by Dan and Les was affixed to the Jones Place, it was distributed to them as part of the real property by the property settlement agreement, rather than distributed to Dan and Les, as the ranch equipment.

4. ¶Real Property includes: "(1) land; (2) *that which is affixed to land*; (3) that which is incidental or appurtenant to land; (4) that which is immovable by law." Section 70-15-101, MCA (emphasis added).

5. ¶ Personal property and equipment may become a fixture, permanently attached to the real property, pursuant to § 70-15-103, MCA, which provides:

A thing is deemed to be affixed to land when it is:

(1) attached to it by roots, as in the case of trees, vines, or shrubs;

(2) imbedded in it, as in the case of walls;

(3) permanently resting upon it, as in the case of buildings; or

(4) permanently attached to what is thus permanent as by means of cement, plaster, nails, bolts, or screws.

1. ¶To determine whether an object has become a fixture or not, we consider the following factors: "(1) *annexation* to the realty, (2) an *adaptation* to the use to which the realty is devoted and (3) *intent* that the object become a permanent accession to the land. Of those three, the intent of the parties has the most weight and is the controlling factor." *Pacific Metal Co. v. Northwestern Bank of Helena* (1983), 205 Mont. 323, 329, 667 P.2d 958, 961 (emphasis added) (citing *Grinde v. Tindall* (1977), 172 Mont. 199, 201-02, 562 P.2d 818, 820).

2. ¶This Court has never addressed the specific question of whether an irrigation system is a fixture. However, there are several other jurisdictions which have done so, and from our analysis of those cases it is clear that other jurisdictions continue to apply the annexation, adaptation, and intent factors of the fixtures test, with special emphasis on the intent of the person who originally brought the personalty to the property, to the specific facts of each case.

3. ¶The Supreme Court of Wyoming addressed a question similar to the issue in this case, in *Wyoming State Farm Loan Board v. Farm Credit System Capital Corp.* (Wyo. 1988), 759 P.2d 1230.

4. ¶The Wyoming Court first examined whether real or constructive annexation of the pipe to the land occurred. It concluded that because the pipe was attached to the riser pipes only intermittently during the irrigation season and stored away from the field when not in use, it had never undergone a real annexation. It further concluded that the irrigation pipe was not constructively annexed to the land because it was not a necessary and integral part of the land, nor was it of little or no value if separated from the land. The majority concluded that the adaptation factor was the weakest part of the fixture test, because almost anything that is used on the property could be considered a fixture by virtue of its "necessity" for continuing to put the land to that

use. Finally, the Court concluded that there was no evidence that the appellants intended to make the pipe a fixture, but that there was some evidence that they thought of the pipe as equipment because it was listed in security agreements as after acquired machinery and equipment. *See Wyoming State Farm Land Bd.*, 759 P.2d at 1235-36.

5. ¶In *Western Ag Land Partners v. Washington Department of Revenue* (Wash. App. 1986), 716 P.2d 310, the Washington Court of Appeals considered whether a center pivot irrigation system was a fixture which passed on sale of the land without assessment of a sales tax, or "personal property" subject to sales tax. The irrigation system at issue consisted of an underground pipe which conveyed water to a riser pipe, bolted onto concrete slabs, through which it rose to the main arm of the system, which extended from the slabs, resting on wheeled towers eight to ten feet in height, which circled the pivot point by electronic control.

6. ¶The Washington Court applied the annexation, adaptation, and intent tests; however the appellant conceded that the system was adapted to the land and the Court did not discuss that factor in its decision. The Court concluded that the system was affixed to the land, by virtue of its concrete center pivot and underground water lines, as well as by virtue of each system's specific adaptation to the topography of the land it irrigated. *See Western Ag*, 716 P.2d at 312-13.

7. ¶In *Rayl v. Shull Enterprises, Inc.* (Idaho 1985), 700 P.2d 567, the Supreme Court of Idaho considered whether a pivot irrigation system, removed by a tenant at the termination of his lease, was a fixture. Removal of the system in question included digging up underground wires and pipes, as well as unbolting the pivots from cement slabs buried in the ground.

8. ¶The Idaho Court applied the annexation, adaptation, and intention tests. It concluded that the irrigation system was a fixture because: the system was either actually or constructively annexed to the land by virtue of being bolted to cement slabs and attached to pipes and electrical wires buried three or four feet underground, all of which had to be torn up for removal; the system was adapted to the land in that the land was used for farming, the irrigation system was necessary to farm the land, and the system was adapted to the particular ground being farmed; the farmer who installed the pivot system did so with the purpose of farming the land using irrigation; and he destroyed the previous ditch irrigation system that had been used on the land, from which the Court inferred that he intended the installation of the new system to be permanent. *See Rayl*, 700 P.2d at 571-72.

9. ¶Marvin and Charles contend that the Oregon case of *Johnson v. Hicks* (Or. App. 1981), 626 P.2d 938, should guide this Court's decision. In *Johnson*, the respondent

and appellant were neighbors who shared an irrigation system. The appellant and her husband divorced; approximately ten years later the respondent, who was related by marriage to the appellant's former husband, moved the main line of the irrigation system, which lay just inside the appellant's property line, six feet to the north and west, so that it no longer traversed appellant's land. There was some disagreement between the witnesses at trial whether or not the main line moved by the respondent had been underground. Rights to 1500 feet of "moveable" aluminum pipe, used to distribute water from the main line to the appellant's pasture, were not disputed by the parties.

10. ¶The Oregon Court also applied the annexation, adaptation, and intention tests. It concluded that all things attached physically or constructively to the land and adapted to the purpose for which the land is used, are fixtures for purposes of the first two tests, but that the controlling test is the intent of the parties with respect to the permanency of the personalty at the time of its installation. The Court inferred from the evidence that both the respondent's and the appellant's former husband's intentions when they installed the system were that it would be a permanent accessory. *See Johnson*, 626 P.2d at 940-42.

11. ¶In this case, Les and Dan removed plastic and aluminum irrigation pipe which had been stored on the side of the field for the winter. From our review of the record, the characteristics of the equipment they removed appear to be the most similar to the gated irrigation pipe described in the *Wyoming State Farm Loan Board* case. There, and here, the equipment at issue was primarily:

[P]lastic pipe with gates, or windows on one side that can be opened to regulate water flow onto a field. This pipe comes in lengths of twenty or thirty feet and diameters of six, eight, and ten inches. A farmer or rancher uses the pipe by moving the needed lengths to the field on a special trailer and laying them out end-to-end in the proper location. The pipe is then connected to riser pipes that are permanently attached to water lines buried underground. While the installation of the water mainline and the riser pipes clearly involves substantial earthwork, the gated pipe is specifically designed to be lightweight and portable for use in more than one field. A farmer or rancher using this system needs the gated pipe to irrigate. However, any farmer or rancher with a riser pipe connection could attach the gated pipe and irrigate his field with it. The pipe remains above ground at all times, and it is stored away from the field when not in use.

*Wyoming State Farm Loan Bd., 759 P.2d at 1231.*

1.  ¶This system is also very similar to that in the *Johnson* case, except that here the dispute is over the portable, above-ground pipe used to convey water from the main irrigation line and distribute it over the field, while in *Johnson* the dispute was over the removal of the main irrigation line, not the portable pipe. *See Johnson*, 626 P.2d at 939 n.4.

2.  ¶While these cases are informative, we conclude that it is necessary to apply the annexation, adaptation, and intent test to the unique facts of this case.

3.  ¶The clearest cases of annexation are those in which the equipment has some characteristic of permanent physical attachment to the land, such as being buried within the land, or consisting in part of concrete slabs partially buried within the land. Several parties in this case testified that the pipe removed by Les and Dan was portable and easily moveable.

4.  ¶Marvin testified that the pipe was not stacked for the winter, that the alfalfa riser pipes were the only thing removed for the winter. However, he also testified that when he marked the pipe on the Jones property for later identification, it was stacked on the property, rather than laying out and in place. Moreover, Les testified that the pipe had been used on other ranch properties besides the Jones property. There was also testimony which indicated that some of the pipe may not have belonged to the partnership at all, but had been borrowed from a relative.

5.  ¶We conclude that because the pipe was attached to the riser pipes only during the irrigation season and stacked when not in use, there was never a real annexation of the pipe to the land. Nor was the pipe constructively annexed to the land, because it was useful apart from the land, as evidenced by Les' testimony that the pipe was used on other ranch properties. It was also easily and readily replaceable with other pipe, as evidenced by the fact that pipe borrowed from a cousin was used in combination with the rest of the irrigation system. Thus the pipe was not annexed to the land.

6.  ¶Nor can we conclude that the irrigation pipe was adapted to the land. The Jones property was irrigated farm land, and its irrigation system was a necessity for the continued use of the land for irrigated crops; however, the pipe at issue was not an integral part of that system, nor was it adapted to the particular ground being farmed in the way that the remainder of the system was.

7.  ¶The parties all testified as to their intent with respect to whether the irrigation pipe was a fixture or equipment when they negotiated the settlement agreement. However the controlling intent is the objective intent of those who installed the purported fixture. *See Western Ag Land Partners*, 716 P.2d at 313. The objective intent is deduced by the court from all of the circumstances surrounding the

installation of the purported fixture. *See Johnson*, 626 P.2d at 940.

8. ¶Prior to the installation of the gated irrigation system on the Jones property, it was irrigated by a ditch system. The ditches were filled in and the land leveled subsequent to the installation of the gated system. This is evidence of intent similar to that found to be sufficient evidence of intent to affix in *Rayl*. Once again, however, this case is distinguishable because the entire system was not removed, but only the moveable pipe. The pipe was apparently used on other properties, and from this we conclude that there was no objective manifestation of intent to affix the individual lengths of pipe to the Jones property. Finally, we note that here, as in *Wyoming State Farm Land Board*, the Schwend Partnership obtained the funds to purchase the irrigation pipe through a government agency, which held a purchase money security interest in the pipe. This suggests that the partnership thought of the pipe as equipment at the time it purchased it.

9. ¶We conclude that the plastic irrigation pipe in this case does not meet the definition of a fixture, and we affirm the judgment of the District Court which awarded the pipe to Les and Dan pursuant to the terms of the property settlement agreement.

## ISSUE 2

1. ¶Did the District Court err when it adopted a subdivision survey which allocated 2.086 acres of real property to Les Schwend?

2. ¶The construction and interpretation of a contract is a question of law for the court to decide. *See Stutzman v. Safeco Ins. Co. of America* (1997), 284 Mont. 372, 376, 945 P.2d 32, 34. We review a district court's conclusions of law for correctness. *See Carbon County v. Union Reserve Coal Co.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686.

3. ¶The property agreement provides that Tract 1 be "2 acres, more or less, located in the Northwest corner of Tract A - Jones Place (with the boundary of said property defined by the existing hedge plus 10 feet) . . . ." Apparently, Les' home is surrounded by a hedge on only three sides. Marvin and Charles contend that, from the plain language of the property settlement agreement, it is clear that in the area where there is no hedge, the property line should have been drawn straight across from points ten feet beyond the ends of the hedges.

4. ¶"When the language of a contract is clear and unambiguous, the contract does not require the application of the rules of construction and it is the court's duty to enforce the contract as made by the parties." *Keller v. Dooling* (1991), 248 Mont. 535, 539, 813 P.2d 430, 437.

5. ¶An ambiguity exists when the wording of a contract is reasonably subject to two different interpretations. *See Carelli v. Hall* (1996), 279 Mont. 202, 209, 926 P.2d 756, 761. We interpret language of contractual provisions according to its plain, ordinary meaning. *See Morning Star Enter., Inc. v. R.H. Grover, Inc.* (1991), 247 Mont. 105, 111, 805 P.2d 553, 557. The phrase "more or less," may not be particularly precise, but it is certainly a phrase which is commonly understood by its plain and ordinary meaning, and not subject to two interpretations. "More or less" is commonly understood to mean "approximately," regardless of whether one party would prefer "less," while the other party, "more." Therefore, we conclude that the language of the contract is not ambiguous.

6. ¶Tract 1, as surveyed, consists of 2.086 acres. Tract 1, as surveyed, has borders defined by the hedge, except that on the east and southeast side of the subdivision there was no existing hedge at the time of the survey. The purpose of the contract provision at issue, was to effectuate the parties' intent to subdivide Tract 1, on which Les' home stood, from the rest of the Jones Place, which became the property of Marvin and Charles. When Les surveyed the area that was to be subdivided, he created the smallest subdivision which would satisfy the County's drain field requirements and still limited the amount of land subdivided to "2 acres, more or less . . . ." We conclude that Tract 1, as surveyed, complies with the plain language and intent of the property settlement agreement.

7. ¶Accordingly, the judgment of the District Court is affirmed.

8. ¶Les and Dan have asked that we impose sanctions pursuant to Rule 32 M.R.App.P. for an appeal taken without any substantial or reasonable grounds. However, we further conclude that the issue raised by Marvin and Charles which related to the character of the irrigation pipe was not without grounds and, therefore, deny that request.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER