FILED

12/28/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0139

DA 16-0139

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 347

TIM WELU, an individual,

      Plaintiff and Appellant,

    v.

TWIN HEARTS SMILING HORSES, INC.,
a Montana corporation, and STEVE HELD,
an individual,

      Defendants and Appellees.

APPEAL FROM:    District Court of the Sixteenth Judicial District,
                  In and For the County of Powder River, Cause No. DV 38-12-2510
                  Honorable Michael B. Hayworth, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Michael E. Begley, Adam J. Tunning, & Jordan W. FitzGerald, Moulton, Bellingham PC, Billings, Montana

        For Appellees:

                Stephen C. Mackey, Towe, Ball, Mackey, Sommerfeld & Turner, P.L.L.P., Billings, Montana

                          Submitted on Briefs:  September 28, 2016

                                      Decided:  December 27, 2016

Filed:

                                              
                                      Clerk

Justice Patricia Cotter delivered the Opinion of the Court.

¶1 This case stems from a disagreement over the ownership and operation of an irrigation system on a ranch near Broadus, Montana. Tim Welu appeals from the Findings of Fact and Conclusions of Law entered after a bench trial in the Sixteenth Judicial District Court, Powder River County. We affirm.

## ISSUES

¶2 On appeal, Welu raises three issues, which we restate as follows:

*1. Did the District Court err in determining that the entire pivot irrigation system constituted a fixture?*

*2. Did the District Court err in concluding that Held did not breach the parties' agreement concerning the pivot irrigation system?*

*3. Did the District Court err in determining that Held and Twin Hearts Smiling Horses, Inc., were not unjustly enriched?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 In 2005, Steve Held and Ginger Held (the Helds), together with David Platt and Diane Case (the Platts), purchased an approximately 6,000 acre ranch roughly 16 miles south of Broadus in Powder River County, called the Twin Hearts Angus Ranch (the Ranch). In 2008, the parties agreed to divide the Ranch into three, approximately 2,000 acre parcels. This division was accomplished in 2009 when an agreement was entered into between the Helds, the Platts, and Tim Welu. Under the 2009 agreement, Welu purchased one of the three 2,000 acre parcels, while the Helds retained a 2,000 acre parcel, and the remaining 2,000 acre parcel was transferred to the Platts. In addition to the tracts of land, the parties obtained certain rights relating to the entirety of the Ranch:

2

Welu acquired the exclusive use of hunting rights on the entire Ranch during his lifetime; the Platts were granted exclusive recreational use of the Ranch during their lifetime; and the Helds were granted an exclusive privilege to use the Ranch for livestock grazing purposes. Subsequently, the Helds transferred ownership of their parcel to Twin Hearts Smiling Horses, Inc. (THSH), and Welu transferred ownership of his parcel to Twin Hearts, LLC.

¶4 As indicated by the exclusive rights he acquired in the 2009 agreement, Welu's purpose in acquiring an interest in the Ranch was to use the land to hunt game animals. For this purpose, he identified areas suitable for attracting and retaining game animals within the Ranch property. Among these were areas within Held's portion of the Ranch that had previously been used to grow crested wheat without irrigation, as well as areas that had not previously been irrigated. Welu believed that irrigated alfalfa fields would increase the amount of game attracted and retained on the property in those areas. Initially, Welu and Held attempted to utilize a flood irrigation system, already located in the area but in disrepair and inoperable, to grow alfalfa. These efforts ceased in 2010 after the failure to restore the flood irrigation system to the operational condition desired by Welu.

¶5 Subsequently, Welu proposed to irrigate the area using a pivot irrigation system. This proposal was memorialized in an email sent to Steve Held in December 2010 which, because of its importance to the underlying action, we restate here:

> 1. I would pick up the primary costs associated with set up and installation.
> 2. I would expect you to be responsible for all on going [sic] maintenance and operational costs . . .

> In other words, this is a 1 time cost for me. You will maintain them and operate them. You will make sure we have green fields to hunt on. A pump goes out, you replace it. I think that is a reasonable expectation given the amount of investment I am looking at. Agreed?

Held responded simply, "Its agreed."

¶6 To fulfill his end of the agreement, Welu selected and hired Agri-Systems, Inc. (Agri) to provide and install the pivot irrigation system, and drew up plans indicating where the irrigation was to occur. Held had prepared the relevant areas and was ready to plant alfafa by April 2011. However, due to installation delays not attributable to either Held or Welu, the irrigation system was not installed until October 2011. Welu and Agri maintain that by October 2011, the irrigation system was fully installed, as evidenced by the fact that Agri had provided Welu with a run through of the system and then winterized it in place. Held disputes whether the irrigation system was fully installed at this point. Of note is a disagreement that occurred between Held and Agri during the installation process. Agri advised Held that he would need to move a portion of a fence on his property because it was hindering the path of movement of one pivot, which prevented the irrigation system from completing a full circle. Further, Agri advised Mr. Held that failure to move the fence would result in the pivot being damaged.

¶7 In early 2012, Welu scheduled a training session with Agri for the purpose of instructing Held on how to operate and maintain the irrigation system. Held did not attend. Nonetheless, at the start of the 2012 growing season, Held proceeded to operate the irrigation system. As a result, a pivot head caught on a fence and was damaged, rendering the pivot unusable until repaired. Further, during Held's operation of the

4

system, a motor was burned out and a supply pipe burst. Due to the damage, the irrigation system was taken offline in May 2012. Shortly after the irrigation system was taken offline, Welu sent an email to Held stating that, "I have instructed Agri to not do any more work on the pivots until I give them further directions," effectively preventing Held from charging repairs to Welu's account or utilizing the parties' original service provider. The pivot irrigation system remained unrepaired and offline during May and June of 2012.

¶8     On July 8, 2012, Welu notified Held that he had sold the pivots and that Agri would enter the property to dismantle and remove the pivots, electrical boxes, motors, pumps, and other components not buried in the ground. After the workers arrived on the property and commenced removing the system, successfully dismantling one of the pivots, Held directed them to leave the property. While they left the dismantled pivot on the property, the workers left without reassembling the system.

¶9     Following Held's refusal to allow his workers to remove the irrigation system, Welu filed the instant action against Held and THSH arguing that the pivot irrigation system should be returned to his possession, that the Defendants had converted his property by exercising unauthorized dominion or control over the irrigation system, that Defendants had been unjustly enriched through their possession of the irrigation system, and that the Defendants have caused him damages by way of lost opportunity and revenue. Held and THSH filed counterclaims against Welu, alleging that Welu had trespassed when he and his workers attempted to remove the irrigation system, that Welu had breached the contract between the two parties by failing to perform (arguing that the

5

irrigation system was never completely or correctly installed, and therefore not operational), that allowing Welu to remove the irrigation system would breach the agreement between the parties, and breach of a general duty of care for the alleged operation of an "unlicensed" outfitting or hunting guide operation.

¶10    The parties tried the case before the Honorable Michael B. Hayworth on March 24 and 25, 2015. The District Court entered Findings of Fact, Conclusions of Law, and an Order resolving the case in favor of the Defendants. The District Court determined that the irrigation system, in its entirety, was a fixture and attached to the real property owned by THSH and, therefore, the irrigation system was owned by THSH. Further, the District Court determined that Welu was not liable to Held and THSH under any of their alleged counterclaims and, similarly, that Held and THSH were not otherwise liable to Welu under any of his alleged claims.

¶11    On appeal, Welu argues the District Court erred in concluding that the entire pivot irrigation system was a fixture, that the District Court erred by determining that Held did not breach the parties' agreement, and that the District Court erred in concluding that Held and THSH were not unjustly enriched by being allowed to retain the pivot irrigation system on their property.

**STANDARD OF REVIEW**

¶12    "We review findings of fact in a civil bench trial to determine if they are supported by substantial credible evidence," while viewing the evidence in the light most favorable to the prevailing party. *JTL Group, Inc. v. New Outlook, LLP*, 2010 MT 1, ¶ 30, 355 Mont. 1, 223 P.3d 912 (citation omitted). "Conclusions of law in this context are also

6

reviewed for correctness." *JTL Group, Inc.*, ¶ 30 (citation omitted). "We apply de novo review to mixed questions of law and fact." *Mlekush v. Farmers Insurance Exchange*, 2015 MT 302, ¶ 8, 381 Mont. 292, 358 P.3d 913 (citation omitted).

**DISCUSSION**

¶13    *1. Did the District Court err in determining that the entire pivot irrigation system constituted a fixture?*

¶14    This Court addressed the issue of whether an irrigation system constituted a fixture under Montana law in *Schwend v. Schwend*, 1999 MT 194, ¶ 11, 295 Mont. 384, 983 P.2d 988. When determining whether the irrigation pipe at issue in *Schwend* was a fixture, we stated "we review a district court's conclusion of law for correctness," citing *Carbon County v. Union Reserve Coal Company*, 271 Mont. 459, 898 P.2d 680 (1995). *Schwend*, ¶ 11. Although our statement was correct, we use this opportunity to briefly clarify the standard of review we apply to a district court's determination as to whether a fixture exists.

¶15    Whether an irrigation system constitutes a fixture depends upon certain factual considerations which, in the context of a civil bench trial, we would review for clear error, determining whether they are supported by substantial evidence. *JTL Group, Inc.*, ¶ 30. However, such a determination also requires us to determine whether those facts satisfy the legal standard provided by § 70-15-103, MCA, and our precedent in *Schwend*. We apply de novo review to the question of whether facts satisfy a legal standard. *BNSF Ry. Co. v. Cringle*, 2012 MT 143, ¶ 16, 365 Mont. 304, 281 P.3d 203. Therefore, though

7

the factual findings are reviewed for clear error, the question of whether an irrigation system constitutes a fixture is reviewed de novo.

¶16 Personal property may become a fixture pursuant to § 70-15-103, MCA, which provides, in relevant part, that "[a] thing is deemed to be affixed to land when it is . . . permanently attached to what is thus permanent as by means of cement, plaster, nails, bolts, or screws." Section 70-15-103(4), MCA. We consider the following factors when determining whether personal property has become affixed to the realty: "'(1) annexation to the realty, (2) an adaptation to the use to which the realty is devoted, and (3) intent that the object become a permanent accession to the land.'" *Schwend*, ¶ 15 (quoting *Pacific Metal Co. v. Northwestern Bank of Helena*, 205 Mont. 323, 329, 627 P.2d 958, 961 (1983)).

¶17 We emphasize that, as illustrated by our decision in *Schwend*, the specific question of whether an irrigation system is a fixture requires application of the annexation, adaptation, and intent test that is *unique to the facts of each case*. *Schwend*, ¶ 27. Therefore, we address each factor in turn.

###    A.    Annexation

¶18 "The clearest cases of annexation are those in which the equipment has some characteristic of permanent physical attachment to the land, such as being buried within the land, or consisting in part of concrete slabs partially buried within the land." *Schwend*, ¶ 28.

¶19 Welu argues the District Court erred in determining that the entire pivot irrigation system was annexed to THSH's real property because the aboveground elements,

8

including the "spans, towers, rotophases, and electrical panels" were distinct pieces of equipment, relatively easy to remove and relocate. Welu appropriately directs this Court to *Schwend*, where we held that portions of an irrigation system may be personal property, while other portions may be fixtures. *Schwend*, ¶¶ 30, 34. In *Schwend*, we determined that annexation did not occur where the irrigation piping at issue had been removed and stacked away from the irrigated fields, was attached to the irrigation system only during the irrigation season, had been used on other property apart from the property at issue in the proceeding, and where testimony tended to show that some of the irrigation pipe at issue was owned by a third party. *Schwend*, ¶¶ 29-30. Further, we described the specific irrigation pipe at issue in *Schwend* as follows:

> "Plastic pipe with gates, or windows on one side that can be opened to regulate water flow onto a field. This pipe comes in lengths of twenty or thirty feet and diameters of six, eight, and ten inches. A farmer or rancher uses the pipe by moving the needed lengths to the field on a special trailer and laying them out end-to-end in the proper location. The pipe is then connected to riser pipes that are permanently attached to water lines buried underground. While the installation of the water mainline and the riser pipes clearly involves substantial earthwork, *the gated pipe is specifically designed to be lightweight and portable for use in more than one field.* A farmer or rancher using this system needs the gated pipe to irrigate. However, any farmer or rancher with a riser pipe connection could attach the gated pipe and irrigate his field with it. The pipe remains above ground at all times, and it is stored away from the field when not in use."

*Schwend*, ¶ 25 (emphasis added) (quoting *Wyo. State Farm Loan Bd. v. Farm Credit Sys. Capital Corp.*, 759 P.2d 1230, 1231 (Wyo. 1988)).

¶20   The factual circumstances surrounding the pivot irrigation system at issue here are noticeably different from those we addressed in *Schwend*. There is no evidence in the record that the parties intended the pivot irrigation system to be moved to different

9

locations on different fields. Instead of removing and stacking the pipes as the parties did in *Schwend*, this pivot irrigation system was winterized in place. We note further that this pivot irrigation system was not specifically designed to be used in more than one location, as the *Schwend* irrigation pipe was. Unsurprisingly, there was no evidence that the irrigation system at issue here had been used on other properties previously. In order to install the pivot irrigation system, Agri filled in existing, although inoperable, irrigation ditches from the previous flood irrigation system on THSH's property. Further, each pivot arm had to be assembled in specific lengths pursuant to its unique location on the THSH property.

¶21 Given these particular facts, we find that there was substantial evidence tending to show annexation in this instance which outweighed any evidence against such a conclusion. Therefore, we hold that the District Court did not err in concluding that the pivot irrigation system was factually annexed to THSH's real property within the meaning of our precedent involving fixtures.

### B. Adaptation

¶22 The second factor considered when determining whether a piece of personal property constitutes a fixture is whether the property has been adapted to the use to which the realty is devoted. *Schwend*, ¶ 15. In *Schwend*, we determined that, although the irrigation system at issue was located on irrigated farmland and necessary for the continued use of the land for cultivating irrigated crops, the irrigation pipes at issue had not been adapted to the land because they were not "an integral part of that system, nor [were they] adapted to the particular ground being farmed in the way that the remainder

10

of the system was." *Schwend*, ¶ 31. Welu argues the District Court erred in determining that the pivot irrigation system was adapted to the realty because Held had not previously irrigated the land at issue and because the system was capable of use on other property. However, there are particularly persuasive factual circumstances we noted in *Schwend* that Welu ignores. Specifically, the determinative question here is whether the pieces of the pivot irrigation system Welu sought to remove were an integral part of the pivot irrigation system as a whole, and whether the removable components were adapted to the particular real property at issue.

¶23 As noted above, the components Welu sought to remove included the "spans, towers, rotophases, and electrical panels." In other words, Welu argues that he should be able to remove, essentially, every aboveground piece of the pivot irrigation system. However, under the factual circumstances present in this case, it is indisputable that these components constituted an integral part of the pivot irrigation system as a whole. The record reflects that the installation of the pivot irrigation system required that Agri visit the THSH property and assemble each individual pivot arm in specific lengths, tailored to fit its location on THSH's property. Further, pivot arms were assembled in specific lengths for five separate locations on the Ranch, and were winterized in place once installed, rather than removed for storage. Under these factual circumstances, we determine that the components Welu sought to remove from THSH's property were specifically adapted to the realty. Therefore, because we determine that the components at issue were both an integral part of the pivot irrigation system and were specifically

adapted to the realty at issue, we conclude that the pivot irrigation system as a whole was adapted to the realty.

### C.     Intent

¶24     When addressing the intent factor in its Findings of Fact and Conclusions of Law, the District Court stated that "[s]ignificantly, the intent issue is one of determining *objective* intent." (Emphasis in original.)  This is not a complete statement of the law.  In *Schwend*, we noted that of the three factors, "the intent of the parties [is given] the most weight and is the controlling factor." *Schwend*, ¶ 15.  However, we also stated that, while all parties in *Schwend* had testified as to their intent regarding the irrigation pipe, "the controlling intent is the objective intent *of those who installed the purported fixture.*" *Schwend*, ¶ 32 (emphasis added).  The objective intent of the installing party "is deduced by the court from all of the circumstances surrounding the installation of the purported fixture." *Schwend*, ¶ 32.  Further, we find instructive a statement by the Wyoming Supreme Court, which noted "[t]his intention does not refer to the annexor's subjective state of mind; rather it is the objective intention the law can infer an ordinary reasonable person to have based on the facts and circumstances in the record." *Amoco Prod. Co. v. Wyo. State Bd. Of Equalization*, 15 P.3d 728, 733 (Wyo. 2001).

¶25     Prior to the installation of the pivot irrigation system, the land Welu identified as suitable for planting food plots for attracting game animals had either not been previously used for agricultural purposes or was not currently being irrigated.   Initially, Welu endeavored to restore the existing, but inoperable, flood irrigation system located on TSHS's property.   When those efforts failed, he sought to install the pivot irrigation

system at issue in this case. During the installation of the pivot irrigation system, Welu and Agri filled in portions of the ditches that were part of the existing, but inoperable, flood irrigation system. Both systems were purposed towards creating irrigated alfalfa fields with the help of Held, the last cutting of which would be left on the field in the fall to attract game animals. Further, Welu testified that the agreement concerning the pivots was not limited to a specific timeframe, but would carry through as long as the parties owned their respective properties and Welu owned his exclusive right to hunt throughout the entire Ranch. Specifically, he testified that he may have the hunting rights "for the next thirty years."

¶26    Under the facts of this case, it is clear that Welu intended to create perennial hunting grounds through the use of irrigation and the assistance of Held on the Ranch for at least the next thirty years. Filling in portions of the existing irrigation ditches located on THSH property is further evidence of the fact that Welu intended the pivot irrigation system to be permanent. We determine that the objective circumstances surrounding Welu's installation of the pivot irrigation system illustrate that it was his intent for the system to become a permanent fixture on the land.

¶27    Therefore, because the pivot irrigation system was annexed to the realty, adapted to the realty, and installed with the intent to remain permanently on the realty, the District Court did not err in holding that the pivot irrigation system was a fixture attached to the realty owned by THSH.

¶28    *2. Did the District Court err in concluding that Held did not breach the parties'*
       *agreement concerning the pivot irrigation system?*

13

¶29 As noted above, Held had two primary obligations under his agreement with Welu: first, he would be responsible for all ongoing maintenance and operational costs; and second, he would ensure Welu had green fields to hunt on. The District Court determined that as of October 2011 Welu had fulfilled his obligation to install a functioning irrigation system on Held's property, triggering Held's duty to maintain the irrigation system and provide green fields for hunting purposes. On May 3, 2012, citing ongoing issues with the irrigation system, Welu informed Held that he had instructed Agri "not to do any more work on the pivots until I give [Agri] further directions." The District Court noted that, had Welu not interfered and prevented Agri, the contractor who had installed the pivot irrigation system, from working on the pivots, Held would have had sufficient time, as of May 3, 2012, to plant and pivot irrigate an alfalfa crop to provide Welu's required "green fields to hunt on" by the start of the fall hunting season, in satisfaction of the contract. Further, as noted by Welu on appeal, the District Court determined that Held had not breached the agreement between the parties as of early July 2012, when Welu attempted to remove the pivot irrigation system from Held's property and subsequently filed the instant lawsuit.

¶30 The interpretation and construction of a contract is a question of law which, in the context of a District Court's ruling in a civil bench trial, we review for correctness. *See Bos Terra, LP v. Beers*, 2015 MT 201, ¶ 17, 380 Mont. 109, 354 P.3d 572. "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Section 28-3-301, MCA. Further, "[t]he whole of a contract is to be taken together so as to give effect

14

to every part if reasonably practicable, each clause helping to interpret the other." Section 28-3-302, MCA.

¶31 It is undisputed that, at the time they entered into the agreement concerning the pivot irrigation system, it was the intention of the parties to provide Welu with green fields on which to hunt. Indeed, the record reflects that Welu's sole purpose in acquiring land from Held in the first place was to enjoy the hunting that he thought the area could be manicured to offer. Accordingly, as the agreement provided, Held's duty to maintain and repair the pivot irrigation system was intended to "make sure we have green fields to hunt on." The District Court found that Held had not breached the parties' agreement as of the time that Welu directed that Agri not undertake any more work on the pivots, because there was still sufficient time for Held to repair the pivot irrigation system and cultivate green fields for hunting prior to the start of the 2012 hunting season, but for Welu's interference. The facts found by the District Court in this regard are supported by substantial credible evidence. Therefore, we conclude that the District Court did not err in determining that, as of July 2012, when Welu commenced this lawsuit, Held had not breached the parties' agreement.

¶32 *3. Did the District Court err in determining that Held and Twin Hearts Smiling Horses, Inc., were not unjustly enriched?*

¶33 "Unjust enrichment is an obligation created by law in the absence of an agreement between the parties." *Estate of Pruyn v. Axmen Propane, Inc.*, 2009 MT 448, ¶ 63, 354 Mont. 208, 223 P.3d 845. In other words, courts have applied the doctrine of unjust

15

enrichment when a contract in law is implied by the facts and circumstances of the case, but no actual contract exists between the parties.

¶34 The District Court determined that the parties' email exchange formed an express contract between the parties. The District Court noted that the agreement required Welu to provide the "set up and installation" of the pivot irrigation system, and required Held to be "responsible for all on going maintenance and operational costs." Further, the District Court determined that Welu's purpose for the contract was to attain "green fields to hunt on" during the hunting season, and that Held's purpose was to receive irrigation equipment to support the growth of harvestable crops from the irrigated area, as long as he left the final cutting standing to provide the "green fields to hunt on" required by Welu.

¶35 Further, while Welu repeatedly refers to the "Pivot Maintenance Agreement" in his arguments to this Court, he also argues that, while there was an agreement between the parties as to the maintenance of the pivot irrigation system, there was no agreement as to the permanent ownership of the system. Essentially, Welu asks this Court to hold that, even when there is a contract between the parties specifically relating to the property at issue in a proceeding, unjust enrichment should be an available remedy if the contract does not specifically mention who has permanent ownership of the property at issue. We decline to do so in this case.

¶36 Neither party disputes the existence of a contract involving the pivot irrigation system at issue. Because it is undisputed that a contract exists, Welu's unjust enrichment arguments are not well taken. *Estate of Pruyn*, ¶ 63. The Dissent would have this Court

16

reach the merits of Welu's unjust enrichment claim, arguing that because the contract did not expressly cover ownership of the pivot irrigation system, the contract does not preclude an unjust enrichment claim. We disagree.

¶37 The Dissent relies on *Robertus v. Candee*, 205 Mont. 403, 407, 670 P.2d 540, 542 (1983), to support its premise that "providing restitution to a contracting party who has a claim against the recipient of his performance is the well-settled principle of equity in other jurisdictions." Dissent, ¶ 55. *Robertus* is factually distinguishable from the instant case. In *Robertus*, the plaintiffs had leased two tracts of land from the defendant. *Robertus*, 205 Mont. at 405, 670 P.2d at 541. In the fall of 1977, a dispute arose as to the amount of rent owed for one of the tracts of land. *Robertus*, 205 Mont. at 405-06, 670 P.2d at 541. At that time, the plaintiffs had prepared and planted a portion of that tract, incurring certain expenses. *Robertus*, 205 Mont. at 406, 670 P.2d at 541. The following spring, the defendant "informed [the plaintiffs] that they could no longer enter his land and terminated both lease agreements." *Robertus*, 205 Mont. at 406, 670 P.2d at 541. The defendant proceeded to harvest and sell the wheat the plaintiffs had planted. *Robertus*, 205 Mont. at 406, 670 P.2d at 541. Subsequently, the plaintiffs sued to recover the monetary value of the benefit the defendant had gained by the work plaintiffs had put into the land, which they alleged to be $55,000. *Robertus*, 205 Mont. at 406, 670 P.2d at 541. The District Court noted that while the plaintiffs were precluded from suing under the lease because the Statute of Frauds rendered the lease an unenforceable oral agreement, they were entitled to recover based on the theory of unjust enrichment. *Robertus*, 205 Mont. at 407, 670 P.2d at 542. On appeal, this Court affirmed, concluding

17

that "where one party repudiates a contract or breaches it by non-performance, the injured party may seek restitution of the unjust enrichment whether the Statute of Frauds applies or not." *Robertus*, 205 Mont. at 407, 670 P.2d at 542.

¶38 In summary, *Robertus* dealt with circumstances where the non-breaching injured party was suing the breaching party to recover a benefit retained by the breaching party. Because Welu is suing Held, who had not breached the agreement at the time of the suit, *Robertus* is of no assistance at all here. As the Dissent points out, the Restatement has identified circumstances in which a breaching party may recover from a non-breaching party based on the theory of unjust enrichment; however, these circumstances are not present in the instant case.

¶39 In full, § 374 of the Restatement (Second) of Contracts, entitled Restitution in Favor of Party in Breach, states:

> (1) Subject to the rule stated in Subsection (2), if a party justifiably refuses to perform on the ground that his remaining duties of performance have been discharged by the other party's breach, the party in breach is entitled to restitution for any benefit that he has conferred by way of part performance or reliance in excess of the loss that he has caused by his own breach.
> (2) To the extent that, under the manifested assent of the parties, a party's performance is to be retained in the case of breach, that party is not entitled to restitution if the value of the performance as liquidated damages is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss.

¶40 The rule cited by the Dissent is grounded in the theory that where a party justifiably refuses to perform based on the *other party's breach*, unjust enrichment serves as a vehicle to reimburse him for the benefit he has conferred on the party *who has already breached the agreement*. Under the Dissent's interpretation of the case, Welu is

18

the party justifiably refusing to perform citing Held's apparent breach. Dissent, ¶¶ 54-55. However, the District Court found, and we agree, that Held had not breached the agreement as of the date Welu sought to remove the pivot irrigation system and subsequently filed suit. Therefore, the predicate required by § 374 of the Restatement— that the party be justified in his or her refusal to perform based on the other party's breach—is not present here.

¶41    The Dissent's argument for relief under the doctrine of unjust enrichment is not only precluded by the Restatement itself, but is also relief that Welu did not request under that theory. Dissent, ¶¶ 56-57. Welu recognized that, if this Court determined the pivot irrigation system constituted a fixture, which we have, he is limited to the recovery of monetary damages. The Dissent, on the other hand, citing § 374 of the Restatement (Second), contends that unjust enrichment should serve as a vehicle to return the aboveground portions of the pivot irrigation system that were "wrongfully" retained by Held, to Welu. Section 372 of the Restatement (Second) of Contracts explicitly states that specific restitution, meaning restitution of identifiable assets, is not available under the rule stated in § 374.

¶42    Further, even if we were to assume that it was possible for Welu to proceed on an unjust enrichment claim, applying the doctrine in this case would contravene decades of this Court's well-established precedent. The Dissent urges us to apply the doctrine of unjust enrichment based on the theory that an implied contract exists as to ownership of the pivot irrigation system. Dissent, ¶ 56. The Dissent goes on to state that "unjust

19

enrichment does not always require a wrongful act." Dissent, ¶ 57. This is a misleading characterization of the law.

¶43 This Court has yet to find unjust enrichment stemming from an implied contract appropriate, absent some element of fault or misconduct on the part of the defendant. *See, e.g.*, *Sebena v. State*, 267 Mont. 359, 367, 883 P.2d 1263, 1268 (1994); *Ragland v. Sheehan*, 256 Mont. 322, 327, 846 P.2d 1000, 1004 (1993); *Randolph V. Peterson, Inc., v. J.R. Simplot Co.*, 239 Mont. 1, 8, 778 P.2d 879, 883-84 (1989); *Brown v. Thornton*, 150 Mont. 150, 156, 432 P.2d 386, 391 (1967); *Estate of Pruyn*, ¶ 64; *Hinebauch v. McRae*, 2011 MT 270, ¶ 29, 362 Mont. 358, 264 P.3d 1098; *Albinger v. Harris*, 2002 MT 118, ¶ 21, 310 Mont. 27, 48 P.3d 711; *Lefeber v. Johnson*, 2009 MT 188, ¶ 26, 351 Mont. 75, 209 P.3d 254. The Dissent argues that wrongful acts sufficient to satisfy the requirement of our precedent occurred in either the purported violation of the "inordinate amount of trust" Welu had in Held, for which the Dissent apparently finds support in the record, or in the form of Held's refusal to allow Welu to remove portions of the pivot irrigation system. Dissent, ¶¶ 57-58. Implicit in these arguments is the Dissent's refusal to address this case within the temporal snapshot presented to this Court on appeal. The District Court determined that, at the time of Welu's actions in May and July of 2012, Held would still have been able to produce the "green fields to hunt on" required by Welu under the contract. Therefore, there had been no breach of the agreement by Held and, at the time the case was brought, no actual violation of the "inordinate amount of trust" Welu had in Held. In short, because the Court found no fault or misconduct on the part

20

of Held, our precedent does not support the imposition of an unjust enrichment recovery against him.

¶44 We acknowledge that a constructive trust may be imposed in the absence of any wrongdoing on the part of the defendant, *see Northern Cheyenne Tribe v. Roman Catholic Church*, 2013 MT 24, ¶ 29, 368 Mont. 330, 296 P.3d 450, but Welu did not argue in the District Court or on appeal for the imposition of a constructive trust, and we decline to *sua sponte* impose such a trust here. In conclusion, the District Court did not err in determining that Welu is not entitled under our precedent to recover from Held on the basis of unjust enrichment.

## CONCLUSION

¶45 Based on the foregoing, we hold that the District Court did not err in determining that the pivot irrigation system was a fixture under the facts of this case, that the District Court did not err in determining that Held did not breach the parties' agreement, and that the District Court did not err in concluding that Held and THSH were not unjustly enriched by the installation of the pivot irrigation system at issue in this case. Affirmed.

/S/ PATRICIA COTTER

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ MICHAEL E WHEAT

Justice Laurie McKinnon, dissenting.

¶46 I disagree that the aboveground portions of the pivot irrigation system were a permanent fixture attached to Held's land. I also disagree that a claim for unjust enrichment is precluded when ownership is determined by operation of statute, rather than pursuant to principles of contract law.

> A. The record does not support a conclusion that the pivot irrigation system was a permanent and physical attachment to Held's property.

¶47 I disagree with the Court's conclusion that the aboveground portions of the pivot irrigation system are a fixture. First, the system does not meet the criteria under *Schwend*, where annexation is most clearly shown by characteristics consistent with permanent, physical attachment to the land. *Schwend*, ¶ 28. The record before us shows that the nature of a pivot irrigation system, and particularly the one at issue here, is, of necessity, mobile. These systems are mobile to an extent that if they are not correctly adjusted, they may be damaged by obstacles in their path, as Held discovered when he failed to account for an obstructing fence, despite Welu's warning. Even though these systems are typically custom-cut for an individual property, as they were here, there was evidence in the record that the aboveground portions of these systems are commonly removed and often disassembled and sold. In fact, prior to filing suit, Welu had already explored selling the irrigation system at issue here, and sought to use it on his other properties in Texas. Further, by the time Held ejected Agri from the land, Agri had already disassembled a portion of the system. Given these facts alone, I cannot see that

22

the aboveground portions of the system exhibited characteristics of being permanently, physically attached to the land.

¶48    Second, to bolster its finding to the contrary, the Court conflates the intent of the parties with sufficient physical characteristics of permanence under *Schwend*: "There is no evidence in the record that the parties intended the pivot irrigation system to be moved to different locations on different fields." Opinion, ¶ 20. Intent of the parties as to mobility has no bearing on the pivot's physical characteristics. Additionally, in that same paragraph, the opinion notes that "there was no evidence the irrigation system at issue here had been used on other properties previously." Opinion, ¶ 20. Essentially, the Court finds persuasive evidence that the system is permanently affixed from the fact that it was bought new, and not previously used. I cannot align with either of those rationales, and thus do not believe the system can be considered annexed under *Schwend*.[1] Welu's aboveground pivot system, which was designed to move as it irrigates and was in the process of being dismantled, cannot reasonably be considered a permanent fixture to Held's land.

¶49    Lastly, I disagree that the intent prong of *Schwend's* fixture test is met here. The Court correctly acknowledges that Welu's intent, as the installing party, bears the most

---

[1]   In *Schwend*, we observed that funds to purchase irrigation systems are obtained frequently through a government agency, which holds a purchase money security interest. While the record in these proceedings is silent as to the source of funding for the irrigation system, it cannot seriously be contended that most farmers and ranchers in Montana would ever be able to obtain "the funds to purchase the irrigation pipe through a government agency, which [would hold] a purchase money security interest in the pipe[,]" if the pipe and aboveground portions of the system were destined to become part of the realty it served. This suggests that the irrigation systems are commonly seen in the agricultural and finance industries as removable in the event the underlying debt is not paid. *Schwend*, ¶ 33.

weight. However, while I agree that Welu meant to create "perennial hunting grounds through the use of irrigation[,]" Opinion, ¶ 26, it does not necessarily follow that this intent can be equated with Welu's intent for the system to be a permanent fixture. I cannot find in the record evidence that he meant for the system to remain on the land for any longer than he was able and so disposed to hunt upon it. Indeed, Welu's stated intent to sell the aboveground portions or use them on his other properties, bolstered in fact by Agri's partial dismantling of those aboveground components, is evidence Welu always intended the system to be removable. An intent that an object remain for so long as a person wishes or is able to hunt—an intent subject to whim and fancy—does not equate to an intent that the object forever remain on the land. Given these analytical inconsistencies of the Court respecting both annexation and intent, it is my opinion that the aboveground portions of this pivot irrigation system do not constitute a fixture.

B. A claim for unjust enrichment is not precluded when ownership is determined by operation of statute, rather than pursuant to principles of contract law.

¶50 Even if the irrigation system is a fixture, however, I disagree too, that Welu should be precluded from restitution under the theory that Held was unjustly enriched. The Court states in ¶ 35 that, "[e]ssentially, Welu asks this Court to hold that, even when there is a contract between the parties specifically relating to the property at issue in a proceeding, unjust enrichment should be an available remedy if the contract does not specifically mention who has permanent ownership of the property at issue. We decline to do so in this case." Denying Welu the remedy of restitution under the theory of unjust enrichment, on the basis that the contract was indefinite or failed to mention ownership,

24

contravenes well-established principles of equity that are evident in our own precedent and the Restatement of Restitution and Unjust Enrichment. Most importantly however, the rationale for denying Welu's restitution is inconsistent with the findings of the lower court which have been affirmed through this Court's fixture analysis.

¶51 The Court's fixture analysis and the unjust enrichment issue are intertwined in a subtle way. Left out of the Court's Opinion is the reason why there is a fixture analysis of the irrigation system in the first place. To be fair, the Court does note that the District Court found that because the irrigation system is determined to be a fixture, Held owns it. However, the Court does not explain the reason why this is so: It is by operation of law, and not as a matter of contractual interpretation. Pursuant to § 70-18-101, MCA, a fixture installed to the land of another belongs to the landowner in the absence of an agreement as to its removability, unless the owner of the land chooses to require the person to remove it. Thus, in the absence of an agreement, the landowner may elect whether to keep the fixture attached to the land or require that it be removed. Significantly, operation of the statute which occurs *in the absence of an agreement*, does not foreclose a claim of unjust enrichment when the landowner elects not to return the fixture.

¶52 Here, the District Court examined the contract between the parties; found that it had no term governing ownership or removability of the pivot irrigation system; determined that the irrigation system constituted a fixture; and then, as a result, declared the system owned by Held, even though Welu had purchased it. By affirming the District Court's fixture analysis, this Court employed § 70-18-101, MCA, and necessarily found

there was no agreement between the parties regarding ownership or removal of the pivot system. Nonetheless, when addressing Welu's unjust enrichment argument, the Court reinjects principals of contract law by indicating the contract was missing an important term—ownership of the system—which precluded Welu's claim of unjust enrichment. Opinion, ¶¶ 35-36. Section 70-18-101, MCA, however, determines ownership as a matter of law in the absence of an agreement between the parties—a significant distinction the Court fails to grasp. As a result, Welu's unjust enrichment claim fails and Held gains a windfall in the form of a million dollar irrigation system which, as the trial court acknowledged in its findings of fact, was never meant to primarily benefit him. Welu, who *was* meant to be the primary beneficiary of the irrigation system, in turn gains nothing and is in fact deprived of the very property from which he was to benefit under the contract. Held gains a windfall where none was ever intended, to the detriment of Welu. Held is therefore unjustly enriched and Welu should be afforded restitution.

¶53 The inconsistency in the Court's rationale underlying its ownership and fixture analysis is overlooked by the Court because it dismisses Welu's equitable plea out of hand, based on an improperly applied rule of *Pruyn*.[2] I would instead reason in a manner consistent with the District Court's findings on the fixture issue: since the contract between the parties contemplated only *maintenance* of the system, and not *ownership* of

---

[2] *Pruyn* requires that to consider unjust enrichment, there must not be an agreement between the parties. *Pruyn*, ¶ 63 (citing *Maxted v. Barrett*, 198 Mont. 81, 87, 643 P.2d 1161 (1982)). *See Bradkin v. Leverton*, 26 N.Y.2d 192, 257 N.E.2d 643, 309 N.Y.S.2d 192 (1970); *Fox v. Lummus Co.*, 524 F. Supp. 27, 29-30 (S.D.N.Y. 1981). At best, this is a poorly articulated rule we incorporated from a New York Federal District Court ruling that does not comport with the rule in other jurisdictions or with the Restatement of Restitution: that restitution from unjust enrichment requires there must not be *an adequate remedy at law* available to the complainant.

the system;[3] and since ownership was in fact statutorily determined; there was no contract between the parties that would preclude an unjust enrichment analysis under *Pruyn*, ¶ 63. In the absence of a contract, "[a]n implied contract . . . springs from principles of natural justice and equity, based on the doctrine of unjust enrichment." *Ragland v. Sheehan*, 256 Mont. 322, 327, 846 P.2d 1000, 1004 (1993). I would therefore reach the issue of unjust enrichment left unexamined by the Court.

¶54 To reach Welu's unjust enrichment claim would be consistent with the Restatement (Third) of Restitution and Unjust Enrichment, our own precedent, and the law in other jurisdictions. Our rule of *Pruyn* notwithstanding, the Restatement (Third) of Restitution and Unjust Enrichment clearly contemplates recovery in unjust enrichment when an existing agreement is indefinite.

> A person who renders performance under an agreement that cannot be enforced against the recipient by reason of
>
> (a) *indefiniteness*, or
> (b) the failure to satisfy an extrinsic requirement of enforceability such as the Statute of Frauds, has a claim in restitution against the recipient as necessary to prevent unjust enrichment.

Restatement (Third) of Restitution and Unjust Enrichment, § 31 (2011) (emphasis added). The contract here was indefinite because it lacked the material terms of severability and ownership of the irrigation system. Further, even if, as the District Court concluded, Welu performed, but breached the contract, the Restatement still contemplates Welu's recovery in § 36: "(1) A performing party whose material breach prevents a

---

[3] *See* fact 62 in Findings of Fact and Conclusions of Law of the District Court, where the court examines what it considers to be objective evidence of ownership, and outside the scope of the existing contract.

27

recovery on the contract has a claim in restitution against the recipient of performance, as necessary to prevent unjust enrichment." Restatement (Third) of Restitution and Unjust Enrichment, § 36 (2011). Even if the issue was not outside of contract, these facts also comport with the Restatement (Second) of Contracts, § 374, and cmt. (a) of the same:

(1) Subject to the rule stated in Subsection (2), if a party justifiably refuses to perform on the ground that his remaining duties of performance have been discharged by the other party's breach, the party in breach is entitled to restitution for any benefit that he has conferred by way of part performance or reliance in excess of the loss that he has caused by his own breach.

(2) To the extent that, under the manifested assent of the parties, a party's performance is to be retained in the case of breach, that party is not entitled to restitution if the value of the performance as liquidated damages is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss.

Cmt. (a) *Restitution in spite of breach.* The rule stated in this Section applies where a party, after having rendered part performance, commits a breach by either non-performance or repudiation that justifies the other party in refusing further performance. *It is often unjust to allow the injured party to retain the entire benefit of the part performance rendered by the party in breach without paying anything in return.* The party in breach is, in any case, liable for the loss caused by his breach. If the benefit received by the injured party does not exceed that loss, he owes nothing to the party in breach. If the benefit received exceeds that loss, the rule stated in this Section generally gives the party in breach the right to recover the excess in restitution.

Restatement (Second) of Contracts, § 374 (1981) (emphasis added). The Court admonishes our examination of the Restatement proposition above, but the Court transposes the position and situation of the parties and thus the Court's analysis is fundamentally flawed. If, as the District Court acknowledged, Welu is the breaching

28

party and there was still time for Held to have performed "but for Welu's interference,"[4] (Opinion, ¶ 31), the Restatement, in both the body of § 374 and comment (a), clearly contemplates Welu's recovery in restitution. Regardless, focusing as the Court does on a contractual analysis and what party breached the contract, while leaving unexamined the Restatement on Restitution and Unjust Enrichment, misses the larger and much more important point—the unjust enrichment here arose not from the contract between the parties, but by operation of statute. With Held's unjust enrichment occurring by operation of statute and thereby wholly outside of contract, it is in the end immaterial what party breached a contract that was indefinite as to the term of ownership.

¶55     Even were we to discount the Restatements, our precedent prior to *Pruyn* and *Schwend* have acknowledged that the harsh results rendered by operation of law against a party to a contract concerning a permanent improvement to land should not preclude that party's recovery in restitution under a theory of unjust enrichment. "Where the labor or money of a person has been expended in a permanent improvement which enriches the property of another, under an oral agreement which cannot be enforced under the Statute of Frauds, that person is entitled to an award for the amount by which such improvements unjustly enriches the property." *Robertus v. Candee*, 205 Mont. 403, 407, 670 P.2d 540, 542 (1983) (citing *Smith v. Kober*, 189 N.W. 377 (Neb. 1922); Restatement (Second) of Contracts § 375 (1981)). Although the Court distinguishes *Robertus* upon its facts,

---

[4] In its findings of fact, the District Court found that Held did not perform his obligation to repair the system, ostensibly because Welu had instructed Agri to stop maintaining the system. This meant that "Held did not repair the pivot irrigation system to full operation during May or June 2012."

(Opinion, ¶¶ 37-38), the Court fails to appreciate the significance of *Robertus* and the proposition for which it is cited:  without compensation for the additional value which improvements have conferred upon the property of another by operation of law, not contract, it is against conscience that one person shall be enriched to the cost and injury of another.  Providing restitution in such circumstances, even to a contracting party who has a claim against the recipient of his performance, is also the well-settled and a general principle of equity in other jurisdictions.  "The essential elements of a quasi-contract or quantum meruit claim are that the plaintiff provided to the defendant materials or services at the defendant's request or with the acquiescence of the defendant, that the materials or services had reasonable value, and that the defendant, despite the demands of the plaintiff, has failed and refused to pay the reasonable value of such materials or services." *Berra v. Bieg Plumbing Co., Inc.*, 584 S.W.2d 116, 118 (Mo. Ct. App. 1979) (cited in *Olathe Millwork Co. v. Dulin*, 189 S.W.3d 199, 206 (Mo. Ct. App. 2006) (finding that there was no valid, enforceable contract between the parties where the agreement at issue was indefinite because it lacked essential terms).

¶56     Since I think it clear that both the District Court and this Court conclude there was no contract as to ownership of the pivot system, and ownership was in fact determined only on the basis of a statute, I would find Welu is not precluded from recovering in equity under a theory of unjust enrichment, and that his plea as to unjust enrichment should be examined.  We stated in *Pruyn* that:

> Unjust enrichment is an obligation created by law in the absence of an agreement between the parties. In other words, courts have applied the theory of unjust enrichment when no contract exists between the parties,

but a contract in law is implied. The doctrine of unjust enrichment is an equitable means of preventing one party from benefiting from his or her wrongful acts. Among other things, a claim of unjust enrichment requires a plaintiff to show the element of misconduct or fault on the part of the defendant *or that the defendant somehow took advantage of the plaintiff.*

*Pruyn*, ¶¶ 63-64 (citations omitted) (emphasis added).

¶57 In my opinion, *Pruyn* would not preclude Welu's recovery. The District Court found the following fact:

> Unjust enrichment is an equitable means of preventing one party from benefiting by his or her wrongful acts, and, *as such, requires a showing of misconduct or fault to recover.* The irrigation system in question was placed on the defendants' property by agreement of the parties. It is a fixture, a part of the real property under Montana law. There is no agreement permitting the plaintiff to remove any of it, as required by Montana law. The Defendants have not committed any wrongful act by retaining it.

District Court's Findings of Fact, Conclusions of Law, ¶ 66 (emphasis supplied). The District Court erred because it failed to consider that, as *Pruyn* notes above, unjust enrichment does not always require a wrongful act. Unjust enrichment may also be found under *Pruyn* where it can be shown the defendant took advantage of the plaintiff. However, in my opinion, Held both committed a wrongful act, and took advantage of Welu. Held's wrongful act arises from the fact that the statute governing the accession of fixtures to land allows the landowner to, at his option, cede the removability of the fixture. Held, as the incidental beneficiary of an irrigation system primarily meant to improve Welu's hunting fortune, could have easily ceded the aboveground portions of the pivot irrigation system. The wrongful act requirement of *Pruyn* is thereby met: Held's refusal to cede or pay Welu for those aboveground portions is a wrongful act.

31

Acknowledging that pursuant to § 70-18-101, MCA, Held was entitled to elect whether to return the aboveground portion of the irrigation system or to keep it, does not transform this argument for Welu's relief into a call for specific restitution, as the Court asserts. Opinion, ¶ 41. If Held chose to keep the system, as he apparently has, Welu is entitled to restitution generally corresponding to the amount of its value under the theory of unjust enrichment.

¶58 Even if Held's retention of the removable portions of the system is not what the Court would consider wrongful, Held is certainly taking advantage of Welu. Welu is rightly faulted for believing that his four sentence email would suffice to govern a complex million dollar transaction involving the property of another. The deficiency of his contract shows he either held an inordinate amount of trust in the goodwill of Held, or that he operated under an extreme ignorance of the law, both accession law and contract law. However, as a matter of equity and justice, Welu's shortcomings in business prudence and legal matters should not serve to enrich Held to the tune of one million dollars when he was, as the trial court determined, merely an incidental beneficiary of Welu's purchase.

¶59 I dissent.

/S/ LAURIE McKINNON